UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JAKSONVILLE DIVISION

ANTONIO K. ADAMS
DOC# U08976,

Plaintiff,

**v.** Case No: 3:23-CV-01427-WWB-MCR

DR. J. GREENFIELD, ET. AL,

Defendant.
______________________________________/

**DEFENDANTS DR. THOMAS CULBREATH AND DR. NEAL CARTER MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Defendants Dr. Thomas Culbreath and Dr. Neal Carter, by and through the undersigned counsel, and pursuant to Rule 56, Fed. R. Civ. P., hereby respectfully move this Court for entry of Summary Judgment in their favor. As grounds Defendants Dr. Thomas Culbreath and Dr. Neal Carter argue that judgment should be granted in their favor as the undisputed material facts establish that there was no eighth amendment violation.

**PROCEDURAL HISTORY**

Plaintiff, a pro se inmate, filed his original complaint on December 05, 2023, alleging eighth amendment claims of deliberate indifference and violation of the A.D.A. (*ECF. 1*), and an amended complaint (*ECF 39*) on June 20, 2025. Plaintiff listed defendants Dr. Greenfield, Dr. Pages, Dr. Emanoilidis, Dr. Carter, Dr.Culbreath, and Nurse Collins. All defendants through their respective counsel filed Motions to Dismiss Plaintiff's Amended Complaint. The court dismissed Plaintiff's official-capacity claims and ADA claims against Defendants without prejudice, and allowed the case to proceed on Plaintiff's Eighth Amendment

individual-capacity claims (*ECF 47)*.

FDC Defendants, Culbreath and Carter now seek dismissal of the eighth Amendment claims pursuant to Rule 56, Fed. R. Civ. P.

**ALLEGATIONS**

Plaintiff is a convicted inmate in the custody of the Florida Department of Corrections (FDC).[1] Plaintiff is currently housed at Florida State Prison. Plaintiff sues Defendants: (1) Dr. Neal Carter, Psychologist ("Dr. Carter"); (2) Dr. Thomas Culbreath, Psychologist ("Dr. Culbreath"); (3) Dr. Jonathan Greenfield, Assistant Supervisor of Psychiatry ("Dr. Greenfield"); (4) Dr. Beltran Pages, Supervisor of Psychiatry ("Dr. Pages"); (5) Dr. George Emanoilidis, Senior Supervisor of Psychology ("Dr. Emanoilidis"); (6) Nurse Practitioner Michael Collins ("Nurse Collins"); (*ECF 39 at 2–4*). Plaintiff's general claim is that Defendants each violated his rights under the Eighth Amendment by continuously denying him adequate mental health and medical treatment while he was housed at Lake Correctional Institution ("Lake C.I."), Suwannee Correctional Institution ("Suwannee C.I."), and Florida State Prison ("FSP"), Plaintiff's claim arises between April 2020 and November 20, 2023. (*Id. at 7 and 39*). Plaintiff's claim against Carter and Culbreath allegedly occurred while at Lake CI and Suwanee CI, from April 2020 to July 09, 2020, *(Id at 4-17).* Plaintiff alleges that Drs. Carter and Culbreath, intentionally and without any medical or professional basis, changed his diagnosis from bipolar disorder to anti-social disorder so they could punish, retaliate, and discriminate against Plaintiff for the "complications" of his mental illness*. (Id. at 39–45, 48–49).* Additionally, plaintiff alleges that Carter decreased his psych grade from a

---

1 *See* FDC Offender Search, http://www.dc.state.fl.us/offendersearch/

six (6) to a one (1), that he was re-diagnosed as antisocial and a security issue which plaintiff contends would end his mental health treatment. Plaintiff contends that this was done to have him transferred to FSP, in hopes that he'd self-destruct and kill himself.

Plaintiff contends that On April 21, 2020, Plaintiff was diagnosed with "bipolar disorder with manic symptoms" and "anti-social disorder" by non-party Board-Certified Psychiatrist M.M. Coetzee ("Dr. Coetzee"), consistent with Plaintiff's prior diagnoses by "multiple psychiatrists." (*Id. at 7*). On May 1, 2020, Plaintiff was ordered to undergo mental health treatment at Lake C.I. (*Id.*). On May 12, 2020, Plaintiff had a psychotic episode, during which he injured an unnamed correctional officer. (*Id.*). Plaintiff was placed on self-harm-observation status ("**SHOS**"), and on May 13, 2020, he was visited by Dr. Carter. (*Id. at 8).* Plaintiff describes this visit as follows:

> Dr. Carter said, "over the last five or six years[,] I've constantly tried to explain to you that you're bipolar, and that's a mental illness that requires treatment with medication, and if not treated, and you do not take your medication that mental illness causes you to become a serious threat to yourself and everyone around you."
> Dr. Carter said, "This is why I've explained to you the importance of taking the medication that has been prescribed to help you deal with your mental illness but you will not fu[**]ing listen."
> Dr. Carter said[,] "you stop taking your medication and the same sh[**] happens every time you experience a psychosis, [you] start entertaining these paranoid and suicidal ideations, [you] become extremely aggressive thinking everyone[']s out to get you, and your depression, anxiety, mood swings, and suicidal thoughts become so intense that you feel like dying and you start trying to kill yourself. It's always the same sh[**] with you."
> Dr. Carter said, "your suicidal behavior is increasing, in the last 24 [hours] there has been two attempts, you have been to [an] outside hospital

multiple times in the past couple of months causing all kind of money to be spent on your procedures and I think the state is wasting to[o] much time and money on a piece of sh[**] like you that's beyond helping. Your mental illness is causing problems for everyone in the mental health department, but I'm about to solve that problem, and save everyone some valuable time and money by getting rid of your ass."

Dr. Carter said, "That officer that was injured during your last psychotic episode is a good friend of mine and I'm going to see to it that you get years for him being injured."

I asked Dr. Carter what . . . he mean[t] by what he said.

Dr. Carter said, "when I'm done with your black ass[,] you're going to be dead."

I told Dr. Carter that "I was going to report that he had threatened my life."

Dr. Carter said, "I didn't say that I was going to kill you myself, you're just a mentally ill piece of sh[**,] and [you are] not worth my freedom."

Dr. Carter said, "I'm going to talk to my boss in Central Office and convince him that you do not suffer from a severe mental illness[,] . . . your actions result from behavior[al] issues[,] and you're only anti-social.

Dr. Carter said, "Then I'm going to have another psychological evaluation done on you and have you re-diagnosed with only being anti-social. I'm going to have your psychological grade decreased from a 6 to a 1, have your medication discontinued[,] and you're going to be barred from all mental health treatment facilities and [from] receiving the mental health services that you need.

Dr. Carter said, "once I have you re-classified as a security issue and not a mental health issue, I'm going to push to have charges filed on you for my friend being injured during your psychosis and have you transferred to [FSP] maximum management unit where you are going to suffer in complete isolation and face punishment for all the problems you and your mental illness [are] causing."

Dr. Carter said, "I'm certain that on [FSP] maximum management unit[,]

> the level of mental services that your mental illness require[s] [is] not provided and staff there are not prepared to deal with you and your psychosis[,] and eventually you're going to self-destruct."
>
> Dr. Carter said, "so I'm not going to kill you or touch you at all, I'm just going to put you into the right position and hopefully you will kill yourself."

*(Id. at 8-10).*

Later the same day, Dr. Pages visited Plaintiff's cell front. (*Id.* at 10). Plaintiff informed Dr. Pages that he was experiencing paranoid and suicidal thoughts, depression, and trouble sleeping. (*Id.*). Then:

> Dr. Pages told Plaintiff that the reason that he was "feeling like that" was because he was not taking his psychotropic medications like he was supposed to be.
>
> Dr. Pages said "I've been treating you and overseeing your treatment for your bipolar illness for several years and you're not responding to treatment how I think you should. You won't comply and take your medication like you should, and when that happens, you become a serious liability to yourself and everyone."
>
> Dr. Pages said, "your la[]test increase i[n] suicidal behavior is costing tons of money from having to send you to [an] outside hospital to have your injuries treated."
>
> Dr. Pages said, "you're becoming extremely aggressive from paranoid ideations[,] which ha[ve] now lead to an officer being injured."
>
> Dr. Pages said, "you have a mental illness that has to be treated with medication[,] and the problems you create whenever you stop taking your medication [are] causing financial and safety concerns[,] and now I'm being told to do something about you."
>
> Plaintiff told Dr. Pages that he was not trying to cause problems[,] and he would start complying and taking his medication as prescribed.
>
> Dr. Pages said, "It's too late, I'm going to have your medication discontinued. I think people like you are beyond help and need to be made

an example of."

Dr. Pages said, "I spoke with Dr. Carter about what he's planning to do and I think he is right. Since you don't want to comply with the mental health treatment that you need, just [sic] let you kill yourself and be done with it."

. . . .

Dr. Pages said, "once we have you re-diagnosed and can explain your actions as deriving from a behavioral issue and not a severe mental illness[,] we're going to have you "barred" from all mental health inpatient treatment facilities and inpatient services.

Dr. Pages said, "we're going to recommend that you be isolated and placed on maximum management in the most secure setting . . . possible and with the least amount of social interaction . . . possible, and have criminal charges filed on you for that officer being injured during your last psychotic episode."

Dr. Pages told Plaintiff that the reason that he was "feeling like that" was because he was not taking his psychotropic medications like he was supposed to be.

Dr. Pages said "I've been treating you and overseeing your treatment for your bipolar illness for several years and you're not responding to treatment how I think you should. You won't comply and take your medication like you should, and when that happens, you become a serious liability to yourself and everyone."

Dr. Pages said, "your la[]test increase i[n] suicidal behavior is costing tons of money from having to send you to [an] outside hospital to have your injuries treated."

Dr. Pages said, "you're becoming extremely aggressive from paranoid ideations[,] which ha[ve] now lead to an officer being injured."

Dr. Pages said, "you have a mental illness that has to be treated with medication[,] and the problems you create whenever you stop taking your medication [are] causing financial and safety concerns[,] and now I'm

being told to do something about you."

Plaintiff told Dr. Pages that he was not trying to cause problems[,] and he would start complying and taking his medication as prescribed.

Dr. Pages said, "It's too late, I'm going to have your medication discontinued. I think people like you are beyond help and need to be made an example of."

Dr. Pages said, "I spoke with Dr. Carter about what he's planning to do and I think he is right. Since you don't want to comply with the mental health treatment that you need, just [sic] let you kill yourself and be done with it."

. . . .

Dr. Pages said, "once we have you re-diagnosed and can explain your actions as deriving from a behavioral issue and not a severe mental illness[,] we're going to have you "barred" from all mental health inpatient treatment facilities and inpatient services.

Dr. Pages said, "we're going to recommend that you be isolated and placed on maximum management in the most secure setting . . . possible and with the least amount of social interaction . . . possible, and have criminal charges filed on you for that officer being injured during your last psychotic episode."

Dr. Pages said, "If we can get everyone in Central Office to agree with us, we're going to put a stop to all the problems your [sic] causing the mental health department, by saving money from having to send you to [an] outside hospital from your suicide attempts and have you punished for all these complications you continue to cause by refusing to comply with treatment for your mental illness."

Dr. Pages said, "But the chances of what we are planning to do happening while you're still considered a patient suffering from a mental illness [are] highly unlikely. So[,] if we have to bend the rules a little by re-diagnosing you as only being anti-social for the plan to work, I'm all for it."

. . . .

> Dr. Pages said, "After you stand trial and serve your punishment on maximum management, and you stop causing so much money to be spent, maybe we will consider allowing you to receive the mental services you need, your [sic] only going to be allowed to receive mental health treatment of an inmate with a psychological grade 1, for now."

*(Id. at 10-13).*

Some time prior to June 4, 2020, Plaintiff was transferred to Suwannee C.I. (*Id.* at 14). On June 4, 2020, he was taken to a medical treatment room for a psychiatric evaluation by Drs. Carter and Culbreath, and non-party Dr. Merchant, on the order of "state leadership" from the FDOC mental health department. (*Id.*). Plaintiff describes the evaluation as follows:

> Dr. Carter said, "you really should just refuse this evaluation and go back to your cell because nothing you're going to say is going to change the outcome, a decision about what to do with you has already been made."
>
> Dr. Culbreath said, "I've already spoken to Dr. Carter and Dr. Pages[,] and I agree that people like you [who] have a mental illness[,] [who] don't want to comply with treatment[,] and [who are] causing problems by not complying with treatment for their mental illness [are] a waste of time and the system[']s resources for mental health services.
>
> . . . .
>
> After Dr. Merchant left the room[,] Dr. Carter said, "you know that evaluation was a waste of time and only being done to look good on paper and that a decision to re-diagnose [you] as being anti-social was made weeks ago."
>
> . . . .
>
> After Dr. Carter left the room[,] Dr. Culbreath said, "Before I came to see you[,] I reviewed your mental health records and there is no question about whether you suffer from a mental illness or not.

> . . . .
>
> Dr. Culbreath said, "state leadership of the mental health department thinks that mental health inpatient treatment units are not secure enough to house you or prevent you from causing so much money being spent, so they instructed me to conduct the evaluation and re-diagnose you with only being anti-social so that you can be re-classified as a behavioral management problem and housed in a more secure setting."
>
> Dr. Culbreath said, "give it some time, and after your court issues are resolved and you serve your punishment, we may consider re-evaluating you and providing you with the services that you need for your illness, but for now this is how things [are] going to be for you, I'm just here to do a job, so it's not personal, it's business."

*(Id. at 14–16).*

On July 9, 2020, Plaintiff was transferred to FSP's maximum management unit. *(Id. at 17).*

## **MEMORANDUM OF LAW**

### Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citations omitted). Summary judgment is appropriate if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Janis v. Pratt & Whitney Canada, Inc.,* 370 F.Supp.2d 1226, 1228 (M.D. Fla. 2005) *quoting* Fed. R. Civ. P. 56(c); *see e.g.*, *Stachel v. City of Cape Canaveral*, 51 F.Supp.2d 1326, 1329 (M.D. Fla. 1999); *see also Heiser v. Reno*, 2012 WL 394612 at *1-2 (M.D. Fla. 2012); *Epperson v. Smith*, 2013 WL 140227 at *2 (M.D. Fla. 2013); *see* Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party has the initial burden of proving that no genuine issues exist, and in making its determination whether the moving party has satisfied its burden, "the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party." *Janis*, 370 F.Supp.2d at1228 *citing Matsushita Elec. Ind. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Heiser*, *supra*, and *Epperson*, *supra*. The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Hickson Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1260 (11th Cir. 2004) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

In opposing a motion for summary judgment, the non-moving party "must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories or admissions that designate specific facts indicating there is a

genuine issue for trial." *Janis*, 370 F.Supp.2d at1228 *citing Celotex Corp., supra*; *see also Heiser*, *supra*, and *Epperson*, *supra*. An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, *supra* at 248. A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997) (internal citations omitted). "If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment." *Janis*, 370 F.Supp.2d at1228 *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). "Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case." *Janis*, 370 F.Supp.2d at1228 *citing Celotex*, 477 U.S. at 322, 106 S. Ct. 2548.

**PLAINTIFF CANNOT DEMONSTRATE AN EIGHTH AMENDMENT CONSTITUTIONAL VIOLATION**

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. *See id.* at 104–06. Not every claim by a prisoner, asserting that he has not received adequate medical treatment, is sufficient to state a violation of the Eighth Amendment. *McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999). Negligence is not enough, and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment does not rise to the level of a constitutional deprivation. Thus, it is well settled that a showing of mere negligence, neglect, or medical malpractice is

insufficient to recover on a §1983 claim. *Estelle,* 429 U.S. at 103; *Adams v. Poag,* 61 F.3d 1538 (11 Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. *Hamm v. DeKalb County,* 774 F.2d 1567, (11 Cir.), *cert. denied,* 475 U.S. 1096 (1986).

In order to show an objectively serious deprivation of medical care, the inmate must demonstrate: (1) an objectively serious medical need that, left unattended, poses a serious risk of harm; (2) that the response made by public officials to that need was poor enough to constitute an "unnecessary and wanton infliction of pain," and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law; and (3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, and that they actually did draw that inference*. Taylor v. Adams,* 221 F.3d 1254, 1258 (11 Cir. 2002).

**MENTAL HEALTH**

Plaintiff, Antonio Adams has been in the department of corrections on his current charges since March 16, 2011, *See Exh 1, at 2, Inmate Movement and Transfer History.* During his time at FDOC plaintiff has had a varied diagnostic history it has included antisocial personality disorder, borderline personality disorder, major depressive disorder, bipolar disorder, and substance induced mood disorder. *See Exh 2, at 6, June 04, 2020 Mental Health Evaluation.* His medication history has also varied but in 2020 included Effexor and Zyprexa which were discontinued after a period of complete remission of all mood symptoms and self-injurious behavior. *Id.*

"Plaintiff has a lengthy history of intensive inpatient psychiatric services during his incarcerations. He has been treated for depression, mood instability, anger and aggression, and substance-induced mental health symptoms. He has a history of significant self-injury at times requiring outside hospitalization and highly assaultive behavior." *See Id at 4.* For the year leading up to plaintiff's allegations, since January 2019 to May 12, 2020, he has had twelve disciplinary reports for battery or attempted battery on a staff member including aggravated battery, plaintiff has had two disciplinary reports for battery on an inmate, five possessions of weapons charges, and six spoken threat charges, amongst other disciplinary reports. *See Exh 3, at 3-5, DR History.*

On April 21, 2020, plaintiff was transferred to Lake Correctional Institution, into the Lake Mental Health Treatment Facility, *See Exh 1, at 11-12, inmate movement, also Exh 4, 4/21/2020 Department Psychiatric Evaluation,* before that transfer he had been back and forth between Suwanee Correctional Institution and Regional Medical Center. *See Id, inmate movement.* Plaintiff was transferred to Lake Mental Health Treatment Facility by approval of the regional mental health director due to an increase in self-injurious behavior, aggression, and refusal of mental health treatment, plaintiff also admitted to refusing his medication. *Exh 4, 4/21/2020 Department Psychiatric Evaluation.* Plaintiff's evaluation noted that he had gone through three months of no self-injurious behavior, that he was transferred to a "undesired facility" at which point he started to refuse his medications, decompensated and resumed self- injurious behavior. *Id* at 1. During this time period plaintiff opened his abdomen by inserting a 14 x 3 cm metal object into his abdomen and inserted a foreign object into his penis. *Id.*

At that point plaintiff was transferred to Lake Mental Health Treatment Facility on April 20, 2020. *See Exh 1, at 11-12, inmate movement.* Plaintiff's diagnosis evaluations revealed he suffered from Bi-polar disorder, anti-social personality disorder, borderline personality disorder and substance abuse mood disorder. *Exh 4 at 5, 4/21/2020 Department Psychiatric Evaluation.* This was the same diagnosis as November 2019. *See Exh 5, at 5, 11/1/19 Department Psychiatric Evaluation.* Plaintiff's medications as of April 21, 2020, included Effexor for depression and anxiety, Zyprexa for impulse control, and Amantadine. *Exh 4 at 1, 4/21/2020 Department Psychiatric Evaluation.* Plaintiff's previous previously prescribed medications include Prozac, Vistaril, Thorazine, Haldol, and prolixin. *Id at 2.*

On or around April 24, 2020, a petition was made requesting that the Court in Lake County issue an Order authorizing the involuntary treatment of plaintiff, *See Exh 6, petition for treatment.* Accompanying that petition for treatment were summaries of diagnosis and observations by doctors Coetzee and Excellent, *See Exh 7, Petition for placement in a mental health treatment facility.* The doctors note that plaintiff had been refusing his medications for three weeks, that he shows symptoms of mood instability, poor impulse control, aggressive/ assaultive behavior, and self-harm behaviors. *See Id.* They point out that he has engaged in self-harm, stabbing himself in the abdomen, requiring outside hospitalization, that plaintiff had stabbed another inmate and had assaults on officers. *See Id.* On May 01, 2024. The court granted the petitions for involuntary treatment, *See Exh 8, Order on involuntary treatment.* On May 12, 2020, plaintiff while in mental health close management at Lake Correctional Institution

stabbed an officer several times with a homemade weapon, the description of the weapon resembling a shank. *See Exh 9, May 12, 2020, DR Report.*

On May 15, 2020, plaintiff was transferred from Lake Correctional Institution to Suwanee Correctional Institution. *See Exh 1, at 12, inmate movement.*

Upon reaching Lake County Correctional Institution an individualized service plan ("ISP") was enacted. The plan noted that the Effexor and Zyprexa had been discontinued. *Exh 10, at 4, Individualized Service Plan 05/14/2020*. The ISP noted his history of self-harm, his recent episodes with a frequency of every 3 out of 7 days; physically assaultive behavior every 3 out of 7 days; mood swings, every day; and self-directed recovery skills, every day. *Id at 1-2.* His 'S' grade or mental health grade was an S-6.[2] *Id at 1*. The plan to deal with all problems included weekly case management and individual counseling; bi-weekly psychiatric follow up; weekly group counseling, therapeutic community, and psycho education groups. The following week plaintiff was noted as having a decrease in abuse to self, 1 out of 7 days, an increase in physically assaultive behavior 4/7 days, notes indicate that this is typically in response to conflict with authorities or feeling disrespected; anger management was added and noted at being a 7/7 days (plaintiff was noted as making requests not receiving them and responding angrily and violently). *Id at 5.* The plan remained the same with psychiatric follow-up changing to weekly rather than bi-weekly. *Id.* His 'S' grade or mental health grade improved to a S-5. *Id at 5*.

---

2 Inmates who are receiving mental health services are provided an individualized services plan (ISP) developed by mental health service providers. Each inmate is assigned a mental health grade ( S-grade) ranging from S-1 ( no indication that mental health care is necessary) to S-6 ( severe impairment that requires court-ordered inpatient mental health care).

By May 21, 2020, plaintiff moved from a crisis stabilization unit[3] to a Transitional Care Unit[4], and the plaintiff's mental health grade improves to a S-4. *See Ex 12, declaration of mental services*. Shortly thereafter, a psychological exam was performed to aid in diagnostic clarification and treatment planning. *See Exh 2 at 3, June 04, 2020 Mental Health Evaluation.* The examination was performed by Dr. Merchant a resident at the time and supervised by Dr. Culbreath. *Id at 1.* The evaluation indicated that Adams had over time increased his self-injurious and assaultive behavior. *Id at 5.* The evaluation further considered plaintiff's history which included his being non-compliant with treatment including psychotropic medication. *See Id.* The evaluation further stated that "per records, inmate Adams has not demonstrated any acute psychiatric issues that necessitated inpatient treatment and more importantly, has not meaningfully engaged in provided treatment services. He was assigned to the Psychological Services Director at Lake C.I. due to high risk and patient presentation. Inmate Adams has exhibited difficulty in establishing therapeutic rapport and maintaining behavioral stability throughout his inpatient treatment. He has previously been diagnosed with unspecified or persistent mood disorder, Bipolar disorder, Antisocial personality disorder, and Borderline personality disorder. His most recent listed diagnosis is Antisocial personality disorder, and Unspecified bipolar disorder based on patient history. A reconsideration of the appropriateness of the diagnosis has been considered." *Id.*

---

3 Crisis Stabilization Care refers to a mental health inpatient treatment unit that includes intensive management, observation, and treatment intervention while seeking rapid stabilization of acute symptoms and conditions

4 Transitional Care Unit (TCU), (refers to a mental health inpatient treatment unit that includes intermediate level care for patients transitioning from a more intensive level of inpatient care (CSU or CMHTF))

A mental status exam was conducted along with behavioral observations, ultimately plaintiff's prognosis was that "his reported and demonstrated mental health symptomology do not appear to be reflective of a psychotic or dissociative spectrum disorder but instead meet criteria for antisocial personality disorder." It was recommended that plaintiff be managed in a highly secure and structured environment with limited access to the social environment, based upon his history of violence against inmates and staff. *Id at 9.* Based upon the evaluation the belief was that plaintiff would benefit more from behavioral approaches aimed at reducing the severity and frequency of high-risk behaviors. *Id at 9-10.* On July 09, 2020, plaintiff was transferred to Florida State Prison. *See Exh 1, at 12, inmate movement.* Plaintiff while at Florida State Prison was still listed as being in a Transitional Care Unit but his mental health grade has improved even to a S-3. *See Exh 12, declaration of mental services*. Thereafter, plaintiff's mental health grade has reduced all the way done to a S-1, but has gone back to S-2, due to continuous self-injurious behavior. *See Ex 12, declaration of mental services*.

**ANALYSIS**

The minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner, both are violated by a government official's deliberate indifference to serious medical needs. *See Lancaster v Monroe Cnty., Ala,* 116 F.3d 1419, 1425 n. 6 (11th Cir. 1997), *Jacoby v Baldwin County,* 596 Fed Appx. 757, 763 (11th Cir. 2014). A deliberate-indifference claim has both an objective and a subjective component: an inmate must prove that he "suffered a deprivation that was,

objectively, sufficiently serious" and that the defendant "acted with subjective recklessness as used in the criminal law." *Gant v Everett,* 162 F.4th 1107, 1111 (11th Cir. 2025); citing *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (citations and internal quotation marks omitted) (clarifying the standard for establishing liability on an Eighth Amendment deliberate-indifference claim).

**NO SHOWING THAT THE DOCTORS WERE SUBJECTIVELY AWARE THAT THEIR CONDUCT CAUSED A SUBSTANTIAL RISK OF SERIOUS HARM**

Plaintiff's mental health problems appear to constitute a serious medical need. The record is clear that plaintiff engages in self-harm and was physically assaultive to prison staff and inmates. However, the second component is not solely about the seriousness of the condition but rather that the defendants Carter and Culbreath were actually aware that their own conduct caused a substantial risk of serious harm to the plaintiff. *Wade, at 1262*. With the Caveat that even if the doctors "actually knew of a substantial risk to inmate health or safety" they cannot be found liable under the Cruel and Unusual Punishments Clause if they responded reasonably to the risk. *Id.* Claims of deliberate indifference come in different varieties, some may be called "inaction cases" that challenge an official's failure to do something, such as a guards and nurses failing to provide seizure medication to an epileptic inmate; or by contrast "action cases" which target prison official's affirmative misconduct. *See Wade at 1259-1260.* Plaintiff does not allege that the doctors failed to do something but that their diagnosis and treatment recommendations fell under affirmative misconduct. Plaintiff's new diagnosis did not take away services or leave him unattended but rather placed him in a highly

secure and structured environment with limited access to the social environment, based upon his history of violence against inmates and staff, he was given weekly case management and individual counseling; weekly psychiatric follow up; weekly group counseling, therapeutic community, and psycho education groups. Plaintiff did not suffer a deprivation of mental treatment but rather a change in diagnosis that emphasized counseling and therapy over medication. Plaintiff alleges that his self-injurious behavior continued and seems to suggest that he should have been placed on medication for bi-polar disorder, however medical judgment decisions do not constitute constitutional violations under the eighth amendment. *Estelle v Gamble,* 429 U.S. 97 at 106, 97 S.Ct. 285 at 292 (1976).

Even accepting plaintiff's allegations of the conversations of the doctors in the light most favorable to the plaintiff, plaintiff is unable to show that the doctors own conduct caused a substantial risk of serious harm to the plaintiff. There is no evidence that the treatment of plaintiff's social disorder through therapy was so deficient as to shock the conscience or be intolerable to fundamental fairness. *See Harris v Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991). What is clear from the record is that several doctors, including the one that made the April 24, 2020, diagnosis that plaintiff deems as being correct, changed their belief that upon information and analysis of plaintiff's history, his condition was the result of a social disorder and not psychosis disorder.[5] Plaintiff has offered and cannot show that a diagnosis such as below is a wrong

---

5 Dr. Coetzee who plaintiff relies on as giving the April 21, 2020 diagnosis that included bipolar disorder also approved the post-May individualized service plans which reclassify plaintiff as primarily a social disorder. *Exh 10 at 4, Individualized Service Plan 05/14/2020*.

diagnosis and even more to the point that Carter and Culbreath were subjectively aware that their diagnosis and treatment caused a substantial risk of serious harm to the plaintiff:

> "Though Adams endorsed symptoms consistent with depression, his presentation is less consistent with a major depressive episode. Inmate Adams reports a history of sleep disturbance, fatigue and loss of energy, feelings of worthlessness, low mood, and passive suicidal ideation. Situational factors seem to contribute significantly to his overall presentation to include his engagement in self-injurious behaviors. In addition to his recent documented SIB which he states is motivated by a desire to leave Suwannee CI, he reports at least two suicide attempts motivated by external factors as opposed to depressive process. Much of the symptoms noted above are based primarily on self-report and are inconsistent with documented mental health history and objective observations of his behavior. These symptoms are also not better explained by a psychotic-spectrum disorder due to lack of sufficient evidence additional psychotic symptomology, such as disorganized speech, impaired reality testing or delusional thought processes. Inmate Adams' discussion of his mental health presentation is indicative of possible externally motivating factors as opposed to depressive process. A diagnosis of Major depressive disorder would also not account for primary presenting issues and concerns such as persistence violence.

*See Exh 2, at 10, June 04, 2020 Mental Health Evaluation.*

The plaintiff is unable to show that this decision by the professional doctors was an intentional misdiagnosis that caused a sufficiently serious deprivation of which the doctors were subjectively aware.

**DEFENDANTS RESPONDED REASONABLY TO THE RISK**

Plaintiff went through multiple evaluations, the doctors relied on his past evaluations, social history and medical history, they interviewed the plaintiff and came up with a diagnosis. Taking the plaintiff's allegations about the defendant's statements in a favorable light to plaintiff, liberally construing and giving them more latitude than probable in favor of the plaintiff, the defendant's actions show that they responded reasonably to the risk of harm. The defendants ensured that plaintiff had medical professionals providing consistent monitoring of plaintiff, weekly case management and individual counseling; bi-weekly psychiatric follow up (modified to weekly); weekly group counseling, therapeutic community, and psycho-education groups. Essentially, they ensured that plaintiff was consistently monitored, counselled and taken care of, responding reasonably to the risk of his self- injurious and aggressive behaviors.

There is no liability under the cruel and unusual punishments clause if the defendants respond reasonably to the risk. *Wade* at 1262.

**A DIFFERENCE IN MEDICAL OPINION IS NOT A CONSTITIONAL VIOLATION**

Plaintiff is unable to show that defendants acted with subjective recklessness as used in criminal law. Plaintiff's allegations and the record put forth by the defendants are materially the same. To summarize, plaintiff after a series of self-injurious behavior, and assaultive actions had his mental health diagnosis changed from a border line bipolar disorder to that of an antisocial personality disorder. Plaintiff seems to disagree with this change and states that the rationale for the new diagnosis and accompanying treatment was because the prison was tired of spending money on his hospital visits,

desired for him to kill himself, and retribution for the stabbing of a guard. Courts in this jurisdiction have long held that a difference of opinion regarding treatment does not support an Eighth Amendment claim. *See Harris v Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991). Prisoners aren't constitutionally entitled to their preferred treatment plan. *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d 1257 at 1277(11th Cir. 2020). A denial of medical care constitutes deliberate indifference "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505. The deliberate indifference standard is a high standard. *West v. Tillman*, 496 F.3d 1321, 1333 (11th Cir. 2007); *see also Johnson v. Lewis*, 83 F.4th 1319, 1327 (11th Cir. 2023) ("Deliberate indifference ... is a 'steep hill' for a plaintiff to climb." *Bayse v. Ward*, 147 F.4th 1304, 1311–12 (11th Cir. 2025). The law is clear, where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of a reviewing court to second guess medical judgments or to require that prison officials adopt the more compassionate of two adequate options. *Kehone,* at 1277.

Plaintiff had refused to follow the mental health directions laid out by his institution, court intervention was sought and a series of evaluations had been conducted. Each evaluation highlighted that plaintiff's issues were less of a psychosis disorder and showed social personality disorders, medical professionals provided consistent monitoring of plaintiff, weekly case management and individual counseling; bi-weekly psychiatric follow up; weekly group counseling, therapeutic community, and psycho-education groups. Based upon numerous evaluations, considerations of

plaintiff's mental history, self-injurious behavior, reasons for his behavior and aggressions the doctors diagnosed and sought to properly treat plaintiff. It should further be noted that both the April 21, 2020, diagnosis of "bipolar disorder with manic symptoms" and "anti-social disorder" by non-party Board-Certified Psychiatrist M.M. Coetzee ("Dr. Coetzee"), consistent with Plaintiff's prior diagnoses by "multiple psychiatrists," which plaintiff relies on as being the correct diagnosis (*Id. at 7*), and the May 14, 2020, Lake County Correctional Institution individualized service plan ("ISP") *Exh 10, at 4, Individualized Service Plan 05/14/2020,* were both approved by Dr. M. Coetzee as the treating psychiatrist.

Thus, a difference in opinion as to the treatment of plaintiff's medical condition does not arise to a constitutional violation. Moreso, the doctor which plaintiff relies on as supporting his position that his condition is a psychosis disorder has signed off on the change to a social disorder. Plaintiff would be unable to show to a jury that the change in diagnosis and treatment was incorrect and even more so that it was grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.

The medical staff cannot be held liable if they responded reasonably to the known risk in this case by providing some form of psychiatric treatment, monitoring the prisoner, and consulting with medical professionals. *See Wade v. McDade*, 106 F.4th 1251 (2024).

Plaintiff's diagnosis are based upon a study of plaintiff's behavior to include his family, trauma, relationship, emotional, social, mental health history, psychological testing, behavior situations and several other factors, coordinated by and including

several doctors at varying times that all arrive at the same diagnosis that plaintiff meets the criteria for an anti-social personality disorder. That even reviewing plaintiff's conversations with Carter and Culbreath in a light most favorable to plaintiff he will be unable to show that his mental health diagnosis was the result of subjective recklessness as used in criminal law.

**NO SHOWING THAT THE DEPRIVATION WAS OBJECTIVELY SUFFICIENTLY SERIOUS**

Plaintiff fails to satisfy the first prong of showing an objectively sufficiently serious deprivation. This first prong is usually established by an inmate failing to receive care, observation or medication. *See Wade at 1259* (description of inaction cases). This case is described in *Wade, Id,* as an "action" case, one involving affirmative misconduct. A medical need is objectively serious if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention — and, in either case, if left unattended, poses a substantial risk of serious harm. *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d 1257 (2020). However, this matter does not involve untreated mental illness but a change in diagnosis, and as such expert conclusion would be needed to get to the first threshold that the change in diagnosis and treatment was a "sufficiently serious deprivation." See *Chandler v Crosby,* 379 F.3d 1278 (a prisoners mere discomfort, without more, does not offend the eighth amendment). Plaintiff, has alleged that he does not agree with the treatment but there has been no showing that psychosis treatment or a lack thereof is a sufficiently serious deprivation, nor are the

facts such that a lay person would easily recognize the necessity for psychosis treatment as opposed to social disorder treatment; for example plaintiff has been engaging in self-injurious behavior before and after the diagnosis change, he could easily allege that giving him medication over therapy was a serious deprivation similarly he can allege that therapy over medication is a serious deprivation; plaintiff needs more such as expert testimony to show that a change in diagnosis and treatment is an objectively serious deprivation. *See Owens v Secretary, Florida Dept. of Corrections*, 602 Fed.Appx. 475 (11th Cir. 2015) (Unpublished opinion, in a Motion to Dismiss ruling, the Court found that where inmate mutilated his arm and ingested a razor blade, was diagnosed with several mental disorders and prescribed treatment by a hospital psychiatric unit and MCI health care providers, he did not allege facts indicating that the FDOC or any of its officials' responses to his serious medical needs was objectively insufficient).

Thus, plaintiff has failed to show that the change in diagnosis and the accompanying treatment was an objectively substantially serious deprivation

**CONCLUSION**

Mr. Adams claims that the mental health practitioners, in particular Doctors Carter and Culbreath violated his Eighth Amendment rights by intentionally misdiagnosing the mental health conditions in an attempt to cause him harm. Doctors Carter and Culbreath along with a number of other doctors at the specific time diagnosed plaintiff with suffering from social disorders with little evidence of a psychotic disorder and changed his treatment accordingly. Plaintiff is unable to show that this was a misdiagnosis or wrong diagnosis, the doctor which he relies as providing the

correct diagnosis (Dr. Coetzee), is the same doctor that signed off on the new diagnosis. He is unable to show that this an objectively sufficiently serious deprivation.

Plaintiff is further actually unable to show that the change in diagnosis and subsequent treatment by the professional doctors was an intentional misdiagnosis that caused a sufficiently serious deprivation of which the doctors were subjectively aware.

Third if the doctors somehow caused a sufficiently serious deprivation of which they were subjectively aware, their constant counseling, different therapies, weekly checkups all are reasonable responses to the risk of harm.

Lastly, plaintiff's claim is essentially a difference in medical opinion in which there is no basis for a jury to find that the Doctors acted with subjective recklessness.

Liberally construed, Mr. Adams has failed to come forward with evidence from which a reasonable jury could conclude that any of these doctors was deliberately indifferent. These doctors treated Mr. Adams at the prison and reviewed his medical and social history, interviewed the plaintiff, and tested the plaintiff in order to determine whether he needed therapy or psychosis treatment. Because the undisputed evidence shows that both doctors did the proper evaluations and treatment courses, no reasonable jury could conclude that either physician doctor disregarded a serious risk of harm and committed a constitutional violation.

To create an issue of fact for trial sufficient to defeat a well-supported Summary Judgment motion, the non-movant's evidentiary material must consist of more than conclusory, uncorroborated allegations from an affidavit. *West v. Higgins*, 346 F. App'x 423, 425 (11th Cir. 2009) (per curiam) (unreported op.) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). For the factual issues to be genuine, they

must have a real basis in the record, cannot be based merely on "information and belief" or unsupported factual allegations. *Earley*, 907 F.2d at 1081. Further, if "two parties tell different stories [where one] is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of Summary Judgment. *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999); See also Rule 56(c), Fed. R. Civ. P.

Respectfully submitted,

JAMES UTHMEIER
ATTORNEY GENERAL

*/s/ Broderick Taylor*
Broderick Taylor (FBN 0648574)
Senior Assistant Attorney General
Office of the Attorney General
Civil Litigation Division - North Florida Bureau
1300 Riverplace Blvd, Suite 405
Jacksonville, Florida 32207
Broderick.Taylor@myfloridalegal.com
(904) 456-6471
*Counsel for Defendants Carter and Culbreath*

## CERTIFICATE OF CONFERRAL

Pursuant to 3.01(g) of this Court's Local Rules, undersigned counsel has not conferred with Plaintiff due to the Motion being a Motion for Summary Judgment..

/s/Broderick Taylor
Broderick Taylor, Esq.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been e-filed via CM/ECF and furnished via U.S. Mail to Antonio K. Adams, DC# U08976, at Florida State Prison, Post Office Box 800, Raiford, Florida 32083, on July 8, 2026.

/s/ Broderick Taylor
Broderick L. Taylor, Esq.