**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

Antonio Adams,

Plaintiff,

v. **CASE NO.:** 3:23-cv-1427-WWB-MCR

Greenfield et al.,

Defendants.
_________________________/

**DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT**

Defendants, Michael Collins, NP, Jonathan Greenfield, M.D., Beltran Pages, M.D., and George Emanoilidis, Psy.D., (collectively "Medical Defendants"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56, hereby move this Court for entry of summary judgment[1] in favor of the Defendants as there are no issues of material fact as to Plaintiff's Eighth Amendment claims. In support thereof Defendants state:

1. Plaintiff, Antonio Adams, is *pro se* convicted Florida Department of Corrections state prisoner currently housed at Florida State Prison.[2]

2. Defendant, Michael Collins, APRN, was an Advanced Practice

[1] The Medical Defendants filed a Motion for Leave to File Excess Pages (Doc. 83), seeking an Order permitting Defendants to file a motion for summary judgment in excess of the 25 pages allotted under Local Rule 3.01(b). As of the date of filing this Motion, no Order has been issued on Defendants Motion for Leave. Thus, in an abundance of caution, the Medical Defendants submit this Motion, to avoid any waiver of the dispositive motion deadline, and certify that they will amend this Motion, if necessary, should the request for excess pages be denied.
[2] https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=U08976&TypeSearch=AI (last accessed 7/3/2026).

Registered Nurse working at Florida State Prison during the relevant time period. (Exhibit A, Declaration of M. Collins)

3. Defendant, Johnathan Greenfield, M.D., was the Assistant Statewide Psychiatric Director for Centurion at Florida State Prison during the relevant time period. (Exhibit B, Declaration of J. Greenfield)

4. Defendant, Beltran Pages, M.D., was the Statewide Medical Director for Centurion at Lake Correctional Institution during the relevant time period. (Exhibit C, Declaration of B. Pages)

5. Defendant, George Emanoilidis, Psy.D., was working as the Psychological Services Director for Centurion at Florida State Prison during the relevant time period. (Exhibit D, Declaration of G. Emanoilidis)

6. On June 20, 2025, Plaintiff filed an Amended Complaint (Doc. 39) asserting claims against the Medical Defendants, amongst others, pursuant to 42 U.S.C. § 1983, for alleged violations of his Eighth Amendment rights[3] under the United States Constitution while he was housed at Lake Correctional Institution ("Lake CI"), Suwannee Correctional Institution ("Suwannee CI"), and Florida State Prison ("FSP"). (Doc. 39).

7. In his Amended Complaint, Plaintiff alleges that the Medical Defendants were deliberately indifferent to his serious medical and mental health needs by: (1) failing to properly diagnose and treat his mental illness; (2) denying

[3] In his Amended Complaint, Plaintiff also alleged ADA claims and official-capacity claims that were dismissed by the Court on 11/20/25 (Doc. 47).

him appropriate psychiatric medications and placement in a Mental Health Treatment Facility ("MHTF"); (3) improperly classifying his mental health status; and (4) failing to provide him adequate medical treatment for the numerous self-inflicted injuries and foreign bodies he repeatedly inserted into his body. (*Id.*)

8. Consequently, Plaintiff alleges he suffered mental, emotional, and physical injuries and seeks compensatory and punitive damages, as well as injunctive and declaratory relief. (*Id.*).

9. However, upon receipt and review of the evidence, the Medical Defendants now move for an Order granting summary judgment in their favor as the evidence confirms that Plaintiff is unable to demonstrate a constitutional violation on the part of any Defendant; therefore, there are no issues of material fact as to Plaintiff's Eighth Amendment claims.

**STATEMENT OF MATERIAL FACTS**

10. Plaintiff entered custody on March 16, 2011, and is currently serving a 25-year sentence related to charges[4] of Aggravated Assault with a weapon, Aggravated Stalking, Battery of Law Enforcement Officer, Felon with Gun and threatened use, Sexual Battery, Adult Sex with a 16–17-year-old. This is Plaintiff's fourth incarceration.

11. Prior to the relevant period and throughout Plaintiff's current incarceration he has spent most of his time in Inpatient Care related to self-

[4] https://pubapps.fdc.myflorida.com/offenderSearch/detail.aspx?Page=Detail&DCNumber=U08976&TypeSearch=AI (last accessed 7/3/2026).

injurious behavior ("SIB"), including "suicidal ideation and non-suicidal self-injury resulting in roughly 28 outside hospitalizations due to cutting his abdomen, and inserting foreign bodies into his abdomen and neck". Plaintiff also has several Outside Hospital admissions prior to the relevant time period. (Exhibits E and F, CENT 166-170 and CENT 159-163).

12. In or around March 2020, Plaintiff was housed at Suwannee CI. At this time, Plaintiff was documented to have a mental health grade of an S5.[5] (Exhibit G, CENT 496-499).

13. On April 20, 2020, Plaintiff was transferred from Suwannee CI to Lake CI. (Exhibit H).

14. On April 21, 2020, a Psychiatric Evaluation was performed by Dr. M. Coetzee, and documents Plaintiff's psychiatric history as "numerous CSU and TCU admissions, SIB and several trips to outside hospitals, long history of multiple hospitalizations, multiple suicide attempts, and medications, outpatient and inpatient prescriptions for mental health, multiple SHOS admissions due to SIB". Dr. M. Coetzee also noted, Plaintiff has history of "alcohol and cocaine use", "prescription substance abuse", and "anger, assault, and mood swings". Plaintiff's prior medications included "Prozac, Vistaril, Thorazine, Haldol, and Prolixin".

[5] An S-grade is a mental health classification that measures psychological stability and determines the level of psychological treatment an inmate requires. S1: requires routine care; S2: requires ongoing services of outpatient psychology; S3: requires ongoing services of outpatient psychiatry such as case management, group and individual counseling, and psychiatric or psychiatric APRN care; S4: assigned to TCU; S5: assigned to CSU; and S6: impaired and assigned to Correctional Mental Health Treatment Facility ("CMHTF"). (https://flcma.gov/wp-content/uploads/ReceptionandMedicalCenter-November2018Survey.pdf)

(Exhibit I, CENT 1041-1045).

15. A May 14, 2020 chart note by Dr. M. Coetzee, Psychiatrist, documents that on May 12, 2020, Plaintiff was seen by Defendant, Dr. Pages, for a quarterly mental health assessment. However, Plaintiff refused to complete the assessment after he was mildly confronted for telling “untruths” to Dr. Pages. One hour later, Plaintiff assaulted and stabbed a correctional officer, four times, and was put on the “DNP” list. (Exhibit J, CENT_4786).

16. Thus, the following day, on May 13, 2020, Plaintiff was seen for a psychiatric assessment by Dr. Pages following Plaintiff's assault on the correctional officer. During the assessment, Plaintiff denied suicidal ideation, homicidal ideation, and hallucinations. Dr. Pages documented that Plaintiff appeared to lack remorse for his actions, noted that the assault appeared planned rather than impulsive, initiated psychotropic medication treatment, and referred Plaintiff for Multidisciplinary Service Team ("MDST") review. (Exhibit K, CENT 4779-8782).

17. Following his assessment, Dr. Pages completed a disciplinary-report evaluation concerning Plaintiff's assaultive conduct. Plaintiff reported that he was angry with a correctional officer and did not intend to kill him. Dr. Pages documented Plaintiff's reported history of self-injurious behavior, including cuts to his abdomen, and assessed Plaintiff's mood as angry and frustrated. (Exhibit L, CENT 4784).

18. Consequently, on the same date, Dr. Pages participated in a multidisciplinary conference call with mental health and medical staff regarding

Plaintiff's diagnosis, treatment needs, and appropriate level of care. During the discussion, it was determined that Mental Health Treatment Facility was not an appropriate level of care at this time. The team reviewed Plaintiff's clinical presentation and noted that there was currently no evidence of psychosis or another qualifying mental health diagnosis to support Mental Health Treatment Facility placement. It was agreed that placement in Close Management ("CM") under maximum management may be considered once the diagnosis is further clarified and confirmed. Dr. Pages recommended and implemented medication changes for Plaintiff, including discontinuation of Zyprexa and initiation of Effexor and Benadryl. (Exhibit M, CENT 4785).

19. Later in the afternoon on May 13, 2020, Plaintiff was found to have a foreign object in his neck and abdominal wall. He was transferred to Orlando Regional Medical Center ("ORMC") for treatment and removal. His chart notes that he engaged in self-injurious behavior by reopening an existing laceration with a paper clip. At the time of the incident, Plaintiff reported experiencing feelings of anger and frustration. Plaintiff stated that the motivation for the act was to obtain hospitalization and as part of a protest or power struggle. Dr. Pages scored Plaintiff's mental health grade as an S6 at the time of this incident.[6] (Exhibits N and O, CENT 42-45, 4786; and CENT 629-643).

20. On May 14, 2020, MDST at Lake Correctional Institution concluded

[6] A mental health grade S6 indicates impaired mental status and assignment to CMHTF (https://flcma.gov/wp-content/uploads/ReceptionandMedicalCenter-November2018Survey.pdf)

that Plaintiff's actions were premeditated in nature and that he did not require Mental Health Treatment Facility Care. Dr. M. Coetzee, Psychiatrist, approved Dr. Pages' recommendation to add a diagnosis of Antisocial Personality Disorder and remove Plaintiff's Bipolar Disorder diagnosis and to start Plaintiff on Effexor and Benadryl. (Exhibit N at p. 5, CENT_4786).

21. On May 15, 2020, Plaintiff was transferred to Suwannee CI. (Exhibit H).

22. On May 27, 2020, Plaintiff was evaluated after he claimed he inserted foreign bodies into his abdomen and urethra. At the time of this incident, Plaintiff was classified as a S4 mental health grade. Plaintiff reported experiencing anger and frustration at the time of the incident and stated that the motivation for the act was to obtain hospitalization and as part of a protest or power struggle. When asked why that area of the body was selected, Plaintiff stated it was chosen because it was "available" and there was an "opportunity" to use "metal/plastic." (Exhibits P and Q, CENT 4788 and CENT 30-33).

23. On May 28, 2020, Defendant, Dr. Greenfield authorized an Order for staff to contact either himself or Dr. Pages after hours for psychiatric emergencies relating to Plaintiff. (Exhibit P).

24. On June 22, 2020, Plaintiff engaged in self-injurious behavior by reopening an existing laceration using his fingers, nails, or teeth. Plaintiff reported anger and frustration as his mood and stated that his motivation was hospitalization and a protest or power struggle. Plaintiff was transferred to

Memorial Hospital Jacksonville for evaluation. (Exhibit R, CENT 26-29).

25. Plaintiff remained at Memorial Hospital of Jacksonville until June 26, 2020. He was discharged after undergoing numerous diagnostic imaging and surgical consults for foreign bodies he claimed were in his abdomen, urethra, and neck that he inserted two weeks prior. On June 25, 2020, APRN Childers reviewed Plaintiff's discharge summary wherein no foreign object was identified in Plaintiff's abdomen or urethra, but two paper clips were removed from his neck. (Exhibit S, CENT 518-643).

26. On June 29, 2020, APRN Childers reviewed Plaintiff's chart, noting previous request from Dr. Varona who submitted a radiology request of CT to Abdomen with contrast and CT of soft tissue neck. (Exhibit T and U, CENT 68 and CENT 153-154).

27. On June 30, 2020, Plaintiff engaged in self-injurious behavior by using his fingers to reopen a wound while housed in the Crisis Stabilization Unit ("CSU"). Defendant, Dr. Emanoilidis classified Plaintiff as an S3 and documented that Plaintiff reported his mood at the time of the self-injury was anger and frustration due to conflicts with security. Plaintiff further stated that his motivations for the act included mood stabilization, suicidal ideation, hospitalization, and participation in a protest or power struggle. Plaintiff reported that his goal was to be transferred to an outside hospital. (Exhibit V, CENT 218-219).

28. On July 6, 2020, Plaintiff again engaged in self-injurious behavior by

inserting his fingers to reopen a wound while housed in the CSU. Dr. Emanoilidis classified Plaintiff as S3 and documented that Plaintiff reported his mood at the time of the self-injury was anger and frustration. Plaintiff further stated that his motivations for the act included mood stabilization, suicidal ideation, and hospitalization. Plaintiff reported that his goal was to be transferred to an outside hospital. (Exhibit W, CENT 220-221).

29. On July 9, 2020, Plaintiff was transferred from Suwannee CI to Florida State Prison and was admitted for inpatient mental health care and SHOS for self-injurious behavior. (Exhibits X and H, CENT 2472).

30. On July 10, 2020, Dr. Emanoilidis evaluated Plaintiff in the infirmary for his SHOS admission and noted that Plaintiff declined to participate in the assessment by shaking his head when asked if he wanted to see mental. Dr. Emanoilidis continued Plaintiff on SHOS status and recommended daily counseling. (Exhibit Y, CENT 2406-2408).

31. On July 13, 2020, Dr. Emanoilidis completed a Sex Offender Screening and Selection assessment of Plaintiff. During the assessment, Plaintiff disputed the description of his offense, stating, “Hell no; none of this happen like this,” and further stated, “No, I don’t need any treatment for this.” Plaintiff received a Grade 3 classification. Dr. Emanoilidis concluded that sex offender treatment was not applicable because Plaintiff did not meet the DSM criteria for a sexual disorder. (Exhibit Z, CENT 204-207).

32. On July 13, 2020, Dr. Emanoilidis evaluated Plaintiff during his

fourth day of SHOS. Plaintiff stated, "I want to get from behind the door. I haven't cut in 18 months." Dr. Emanoilidis documented that the encounter was for evaluation purposes only, assigned Plaintiff a mental health grade of S3, noted that Plaintiff was compliant with prescribed medications, and recommended continuation of SHOS status and daily counseling. Dr. Emanoilidis also initiated Plaintiff's Treatment and Service Plan ("TSP") and Behavioral Risk Plan ("BRP"). (Exhibit AA, CENT 2401-2402).

33. On July 13, 2020, Plaintiff signed a Refusal of Healthcare form declining mental health group services (MHGSX). (Exhibit AB, CENT 22).

34. On July 14, 2020, Dr. Emanoilidis evaluated Plaintiff during his fifth day of SHOS. During this evaluation, Plaintiff stated, "[c]utting myself is just a coping mechanism to manipulate the system." Dr. Emanoilidis documented Plaintiff as mental health grade of S3, noted that Plaintiff was compliant with prescribed medications, and recommended continuation of SHOS status and daily counseling. (Exhibit AC, CENT 2399-2400).

35. On July 15, 2020, Dr. Emanoilidis evaluated Plaintiff during his sixth day of SHOS at which time Plaintiff reported, "I have mood swings. I think I need medicine. Zyprexa used to work for me." Dr. Emanoilidis documented that Plaintiff's medication concerns would be discussed with psychiatry. (Exhibit AD, CENT 2395-2396).

36. On July 16, 2020, Dr. Emanoilidis developed a Self-Injury Reduction Plan for Plaintiff. The plan noted that Plaintiff had been admitted on July 9, 2020,

from the CSU and was then housed on SHOS/MHOS status. Dr. Emanoilidis documented Plaintiff's lengthy history of self-injurious behavior, including impaling himself with various objects in his abdomen, genitals, and neck. The report further noted that Plaintiff had recently acknowledged that past self-injurious behavior had been rewarding because it provided immediate gratification and that he had reported using such behavior as an instrumental means to manipulate and control his environment. Dr. Emanoilidis observed that the frequency and intensity of Plaintiff's self-injurious behavior had increased and concluded that Plaintiff presented a serious and imminent risk of further self-injury unless closely monitored. Dr. Emanoilidis further documented that Plaintiff was motivated to engage in self-injurious behavior to gain immediate gratification, including access to psychotropic medications, major tranquilizers, and transportation to outside hospitals. The report noted that Plaintiff's prior self-injurious acts had resulted in emergency treatment orders, outside hospital interventions, psychiatric restraints, and increased security restrictions. The Self-Injury Reduction Plan established a structured behavioral-management protocol that included continued SHOS monitoring, graduated reductions in observation levels based on periods without incidents, clinical review before discharge from SHOS, placement in a maximum-management high-security cell equipped with a camera, progressively reduced wellness checks, individual therapy focused on reducing self-injurious behavior, and weekly multidisciplinary team reviews of Plaintiff's progress. The plan further provided that any future self-injury incident

would be reviewed by the multidisciplinary team and the behavioral plan would be modified as necessary. (Exhibit AE, CENT 164-165).

37. On July 20, 2020, Dr. Emanoilidis evaluated during his eleventh day on SHOS. Plaintiff reported "I almost slip last night; my moods were up because of beating on the wall." Dr. Emanoilidis recommended that Plaintiff continue in SHOS and daily counseling. (Exhibit AF, CENT 2380-2381).

38. On July 21, 2020, Dr. Emanoilidis authored an Individualized Service Plan ("ISP") documenting that Plaintiff had recently transferred from Suwannee Correctional Institution to Florida State Prison, remained classified as mental health grade of S3, and continued on SHOS status due to recent self-injurious behavior. (Exhibit AG, CENT 159-163).

39. On July 23, 2020, Dr. Emanoilidis evaluated Plaintiff during his fourteenth day of SHOS. Plaintiff reported, "I'm sleeping a little better." Dr. Emanoilidis recommended continuation of SHOS status and daily counseling. The record further noted that Plaintiff was then on one-to-one observation status and would be considered for a transition to fifteen-minute observation checks if clinically appropriate. (Exhibit AH, CENT 2366-2367).

40. On July 27, 2020, Defendant, Dr. Greenfield conducted a psychiatric consultation concerning Plaintiff's treatment and level of care. Dr. Greenfield documented that he agreed with the treatment plan developed by Dr. Emanoilidis. (Exhibit AI, CENT 2890).

41. On July 27, 2020, Dr. Emanoilidis documented in an Infirmary

Progress Record that he consulted with the Regional Mental Health Director ("RMHD") regarding Plaintiff's progression from one-to-one observation to SHOS with fifteen-minute checks. The RMHD approved moving forward with the reduction in observation level. Dr. Emanoilidis further noted that the plan would be discussed with Warden Davis and that the formal order would be written the following morning. (Exhibit AJ, CENT 2351).

42. On July 28, 2020, Dr. Emanoilidis presented Plaintiff to the MDST for review of treatment progress, adjustment to the close management setting, and mental health needs. Dr. Emanoilidis documented that Plaintiff had recently been placed on fifteen-minute observation checks and remained on SHOS status. (Exhibit AK, CENT 203).

43. On July 31, 2020, Dr. Emanoilidis conducted an evaluation of Plaintiff at Florida State Prison as part of an Infirmary Progress Record review. Plaintiff was on his twenty-second day of SHOS and stated, "I'm ok . . . better . . . how long do I have to be on SHOS." Dr. Emanoilidis documented that Plaintiff did not exhibit significant anxiety or depression and appeared primarily frustrated with his circumstances. The record noted Plaintiff's extensive history of self-injurious behavior and that he was compliant with his prescribed Effexor medication. Dr. Emanoilidis assigned Plaintiff a mental health grade of S3 and recommended continuation of SHOS status and daily counseling. (Exhibit AL, CENT 2339-2340).

44. On August 4, 2020, Dr. Emanoilidis again presented Plaintiff to the MDST for review of his treatment progress, adjustment to the Florida State Prison

close-management setting, and any treatment or institutional concerns that could benefit his mental health while housed at the institution. Following the review, the MDST recommended that Plaintiff remain on SHOS with fifteen-minute observation checks and further consult regarding a possible step-down to Maximum Management status. (Exhibit AM, CENT 201).

45. On August 4, 2020, Plaintiff refused mental health services associated with SHOS status, and a Refusal of Health Care Services form was completed. (Exhibit AN, CENT 2457).

46. Upon discharge on August 10, 2020, Dr. Emanoilidis completed a discharge summary documenting that Plaintiff was being tapered off his prescribed medications and had remained free from self-injurious behavior and other incidents for 32 days. Dr. Emanoilidis noted that Plaintiff met the criteria for transfer because he had been self-injury-free and incident-free for 32 days. As a result, Plaintiff was discharged from SHOS and returned to security. (Exhibit AO, CENT 2472).

47. On August 11, 2020, Dr. Emanoilidis completed a Mental Health Consultation memorandum in response to several disciplinary reports received from a disciplinary report investigator. After reviewing the reports, Dr. Emanoilidis concluded that Plaintiff's mental condition did not appear to have substantially contributed to the alleged offenses. (Exhibit AP, CENT 213-215).

48. On August 14, 2020, Dr. Emanoilidis conducted a Mental Health Screening Evaluation. Dr. Emanoilidis documented that Plaintiff reported he was

ready to return to the wing and that Plaintiff's behavioral functioning appeared satisfactory under his current level of care, requiring no additional mental health intervention. Dr. Emanoilidis assigned Plaintiff a mental health grade of S3 at this evaluation. (Exhibit AQ, CENT 196-197).

49. On August 18, 2020, Dr. Emanoilidis conducted a Well-Being Check and documented that Plaintiff's behavioral functioning appeared satisfactory under his current level of care and that no additional intervention was required. Dr. Emanoilidis assigned Plaintiff a mental health grade at S3 at this evaluation. (Exhibit AR, CENT 191-192).

50. On August 19, 2020, Dr. Emanoilidis conducted a Well-Being Check and documented that Plaintiff's behavioral functioning appeared satisfactory under his current level of care and that no additional intervention was required. Dr. Emanoilidis assigned Plaintiff a mental health grade at S3 at this evaluation. (Exhibit AS, CENT 190).

51. On August 20, 2020, Plaintiff was scheduled to participate in an MDST review concerning individualized mental health services but did not attend. Dr. Emanoilidis documented that the information would be reviewed with Plaintiff at a future appointment. (Exhibit AT, CENT 193).

52. On August 20, 2020, Dr. Emanoilidis completed a thirty-day update to Plaintiff's Individualized Service Plan and Self-Injury Reduction Plan. Dr. Emanoilidis implemented a graduated step-down plan for monitoring and treatment, providing for daily wellness checks for two weeks without incident,

followed by reduced wellness checks and continued individual therapy as Plaintiff demonstrated an absence of self-injurious behavior. The plan further provided for weekly multidisciplinary team reviews during the initial eight weeks, with any incidents of self-injurious behavior to be reviewed by the team and the behavior plan modified as necessary. Dr. Emanoilidis also documented that treatment providers and treatment goals had been updated to reflect Plaintiff's progress during the review period and scheduled the next ISP review for December 17, 2020. (Exhibit AT, CENT 157-158).

53. On August 21, 2020. Dr. Emanoilidis conducted a Well-Being Check and documented that Plaintiff's behavioral functioning appeared satisfactory under his current level of care and that no additional intervention was required. Plaintiff was marked as an S3. (Exhibit AU, CENT 189)

54. On August 26, 2020, Dr. Emanoilidis conducted another Well-Being Check and documented that Plaintiff's behavioral functioning appeared satisfactory under his current level of care and that no additional intervention was required. Plaintiff was marked as an S3. (Exhibit AV, CENT 188).

55. On August 28, 2020, Dr. Emanoilidis performed an additional Well-Being Check and documented that Plaintiff's behavioral functioning remained satisfactory under the current level of care. Plaintiff was marked as an S3. (Exhibit AW, CENT 187).

56. On August 31, 2020, Dr. Emanoilidis conducted another Well-Being Check and documented that Plaintiff's behavioral functioning remained

satisfactory. Dr. Emanoilidis further ordered Well-Being Checks three times per week and individual therapy once per week for one month. (Exhibit AX, CENT 186).

57. On September 14, 2020, Dr. Emanoilidis conducted a Mental Health Emergency Evaluation after Plaintiff engaged in self-injurious behavior (insertion of objects into his abdomen and penis) and sustained a laceration. Dr. Emanoilidis documented that Plaintiff's adjustment was poor, attributed the conduct to poor coping skills, and recommended admission to SHOS status upon medical clearance. (Exhibit AY, CENT 171-172).

58. On September 24, 2020, abdominal x-rays ordered by Defendant APRN Collins and interpreted by Dr. Kuehn demonstrated two linear foreign bodies in the region of Plaintiff's penis. (Exhibit AZ, CENT 141).

59. On September 25, 2020, chest and abdominal x-rays ordered by APRN Collins and interpreted by Dr. Kuehn revealed no foreign bodies within the chest but identified multiple foreign bodies in Plaintiff's mid-abdomen, right lower quadrant, and penile region. (Exhibit BA, CENT 140).

60. On September 29, 2020, abdominal x-rays ordered by APRN Collins and interpreted by Dr. Kuehn demonstrated a non-obstructive bowel gas pattern and a retained foreign body in Plaintiff's right lower quadrant. (Exhibit BB, CENT 139).

61. On October 8, 2020, Dr. Emanoilidis completed a Behavioral Risk Assessment and assigned Plaintiff a score of 48, which was classified as severe.

Plaintiff was marked as a mental health grade of S3. (Exhibit BC, CENT 2880-2882).

62. On October 19, 2020, Plaintiff filed a grievance alleging that he had been denied medical care. The grievance response stated that there was no indication Plaintiff had been denied medical treatment, noting that Plaintiff was currently housed in the infirmary and seen daily by medical and mental health staff. Plaintiff was advised that disagreement with a clinician's prescribed treatment regimen did not establish inadequate care. (Exhibit BD, CENT 23).

63. On October 20, 2020, Plaintiff filed a grievance regarding complaints against the medical department and requested copies of his medical records. The grievance response advised that Plaintiff's appointment had been rescheduled because he had been transported to an outside hospital and subsequently returned on SHOS status, where he remained housed. The response further stated that his medical records call-out would be rescheduled upon his discharge from SHOS status. (Exhibit BE, CENT 24).

64. On October 26, 2020, Dr. Emanoilidis responded to Plaintiff's grievance concerning a psychological evaluation and requests for medication. Dr. Emanoilidis denied the grievance and documented that treatment efforts would continue to focus on management of Plaintiff's self-injurious behavior. (Exhibit BF, CENT 209-210).

65. On November 18, 2020, Plaintiff executed a Refusal of Healthcare form declining post-SHOS healthcare services. The form was co-signed by Dr.

Emanoilidis. (Exhibit BG, CENT 19).

66. On November 24, 2020, Plaintiff refused mental health services and a Refusal of Health Care form was completed and co-signed by Dr. Lovette. (Exhibit BH, CENT 17).

67. On January 7, 2021, Dr. Emanoilidis again presented Plaintiff to the MDST for review of treatment progress and mental health needs. Dr. Emanoilidis documented a treatment plan involving short-term therapy to support stabilization of Plaintiff's self-injurious behavior. (Exhibit BI, CENT 2849).

68. On January 11, 2021, J. Downing, RMHCI, MHP, completed and signed a Mental Status of Confinement Inmates form regarding Plaintiff, who had been housed in Close Management status since January 19, 2016. Following an interview conducted that day, MHP Downing documented that Plaintiff exhibited no signs of significant mental or emotional impairment. (Exhibit BJ, CENT 2938).

69. On January 11, 2021, Plaintiff refused a scheduled mental health appointment, and a Refusal of Health Care form was completed and co-signed by Dr. Emanoilidis. (Exhibit BK, CENT 2603).

70. On January 12, 2021, Dr. Emanoilidis conducted a Mental Health Emergency Consultation after Plaintiff complained regarding case-management reassignment, a telephone call with his sister, and wound-care supplies. Dr. Emanoilidis addressed each concern, confirmed scheduled call-outs, encouraged Plaintiff to exercise patience regarding his concerns, and documented that Plaintiff appeared satisfied with the resolution and was provided with sick call request

form. (Exhibit BL, CENT 2846-2847).

71. On January 20, 2021, A. Weston, MHCI, MHP, completed and signed a Mental Status of Confinement Inmates form regarding Plaintiff, who had been housed in Close Management status since January 19, 2016. Following an interview conducted that day, MHP Weston documented that Plaintiff exhibited signs of mild to moderate mental or emotional impairment that could be managed on an outpatient basis and noted that mental health staff would continue to provide the necessary outpatient mental health care. (Exhibit BM, CENT 2937).

72. On January 27, 2021, Plaintiff refused confinement evaluation, case-management services, and therapy. (Exhibit BN, CENT 2601).

73. On February 15, 2021, Plaintiff submitted an Informal Grievance alleging that he was being denied adequate mental health treatment and psychotropic medication. Plaintiff asserted that he had repeatedly requested psychotropic medication to address his psychological symptoms and that Dr. Emanoilidis had denied those requests based upon a June 2020 psychological evaluation concluding that Plaintiff did not suffer from a mental illness and that his symptoms were behavioral in nature. In response, Dr. Emanoilidis advised that Plaintiff's reported symptoms were better addressed through intensive psychotherapy and that psychotropic medications were not recommended at that time. The grievance was denied. (Exhibit BO, CENT 2932-2933).

74. On February 18, 2021, Plaintiff again refused confinement evaluation, case-management services, and therapy. (Exhibit BP, CENT 2600).

75. On April 1, 2021, Dr. Emanoilidis completed a Behavioral Risk Assessment and assigned Plaintiff a score of 53, which remained within the severe-risk category. Plaintiff was marked as an S1 mental health grade. (Exhibit BQ, CENT 2874-2876).

76. On April 22, 2021, Dr. Emanoilidis completed another Behavioral Risk Assessment and assigned Plaintiff a severe-risk score of 41. Plaintiff was marked as an S1 mental health grade. (Exhibit BR, CENT 2871-2873).

77. On May 6, 2021, Dr. Emanoilidis completed an additional Behavioral Risk Assessment and again assigned Plaintiff a severe-risk score of 41. Plaintiff was marked as an S1 mental health grade. (Exhibit BS, CENT 2868-2870).

78. Dr. Emanoilidis also developed a Behavioral Plan addressing Plaintiff's recurrent self-injurious behavior. (Exhibit BT, CENT 2735).

79. On June 7, 2021, APRN Collins reviewed emergency room records following a use-of-force incident. The records reflect that Plaintiff refused a medical assessment, although a visual assessment was completed and documented. (Exhibit BU, CENT 2590 and 2679).

80. On June 9, 2021, APRN Collins documented that Plaintiff had visible pen cartridges inserted into the upper shaft of his penis and a staple in a new abdominal sore. APRN Collins further noted that emergency room records had been reviewed and that Plaintiff was scheduled for evaluation that day. Radiological imaging of the abdomen and pelvis revealed multiple foreign bodies, including a pin within the penile urethra, a battery pack within the rectum, an

additional pin possibly within the stomach, and a small metallic density in the cecum. The radiologist concluded that multiple foreign bodies were present, including newly identified foreign bodies within the penile urethra and rectum. (Exhibit BV, CENT 2643, 2723-2724).

81. On June 10, 2021, Dr. Emanoilidis completed another Behavioral Risk Assessment and assigned Plaintiff a severe-risk score of 44. Plaintiff was marked as an S1 mental health grade. (Exhibit BW, CENT 2865-2867).

82. On June 23, 2021, APRN Collins documented that Plaintiff had foreign bodies in his abdomen and penis and ordered a stat x-ray of the abdomen and pelvis. Radiological imaging, compared to studies from June 9, 2021, revealed that a metallic wire in the mid-anterior abdominal wall remained unchanged, while a previously identified battery pack in the rectum was no longer present. Imaging also demonstrated a small foreign body in the region of the left penile shaft. The radiologist concluded that there was a nonobstructive bowel gas pattern and two remaining foreign bodies, with interval passage of the battery pack from the rectum. (Exhibit BX, CENT 2643, 2704, 2708, and 2728).

83. On June 28, 2021, APRN Collins reviewed radiological imaging of Plaintiff's abdomen and pelvis. The radiologist reported that the findings were otherwise unchanged from the June 23, 2021, studies but identified a metallic density in the distal penile region that was new since the prior examination. The radiologist noted the same finding on both the abdominal and pelvic x-rays. (Exhibit BY, CENT 2576, 2728-2729, and 2731).

84. On June 29, 2021, APRN Collins documented that Plaintiff had foreign bodies in his abdomen and urethra and arranged emergency transfer to Memorial Jacksonville Hospital. Collins completed emergency-transfer documentation reflecting that the transfer was necessitated by self-harm behavior and that mental health staff had been notified. (Exhibits BZ and CA, CENT 2641 and CENT 2670).

85. On July 13, 2021, APRN Collins documented a consult review and noted that Plaintiff was to wash the incision daily while showering. (Exhibit CA, CENT 2641).

86. On July 26, 2021, APRN Collins documented that Plaintiff refused healthcare services, including the assessment of his vital signs. (Exhibit CB, CENT 2586).

87. On October 25, 2021, APRN Collins documented that Plaintiff refused healthcare services related to complaints of chest pain. (Exhibit CC, CENT 2580).

88. On November 8, 2021, APRN Collins reviewed summary for emergency transfer to outside hospital documented by RN J. Duprel. This record showed that Plaintiff "swallowed unknown pills, laceration to left inner upper arm" and foreign objects lodged and protruding. APRN Collins and Dr. Greenfield were notified regarding Plaintiff's transfer. (Exhibit CD, CENT 2668-2669).

89. On November 15, 2021, APRN Collins reviewed radiological imaging of Plaintiff's abdomen. The radiologist reported that the examination showed no acute distress and was not significantly changed when compared to the June 28,

2021, study. The radiologist further noted that, if clinical concerns persisted, follow-up evaluation with a CT scan may be of value. (Exhibit CE, CENT 2721-2722).

90. On November 24, 2021, APRN Collins reviewed an abdominal ultrasound report identifying a ventral hernia extending into the periumbilical scar. The radiologist recommended confirmation with an abdominal CT scan. (See Exhibit CF, CENT 2720).

91. On November 29, 2021, APRN Collins submitted a consultation request for the abdominal x-ray. (Exhibit CG, CENT 2716).

92. On November 29, 2021, APRN Collins reviewed radiological imaging of Plaintiff's abdomen. The radiologist reported the presence of multiple foreign bodies within the stomach. (Exhibit CH, CENT 2715).

93. On December 3, 2021, APRN Collins submitted a consultation request for evaluation by General Surgery. (Exhibit CI, CENT 3023-3024).

94. On December 14, 2021, Plaintiff filed a grievance alleging that APRN Collins was denying him proper treatment. In response, Health Services Administrator Alvarez documented that Plaintiff was receiving treatment based on the severity of his injuries, had recently been sent to an outside hospital, and had a pending General Surgery consultation. (Exhibit CJ, CENT 3012).

95. On December 16, 2021, Mental Health Counselor J. Duprel completed a Mental Health Emergency assessment following Plaintiff's self-inflicted injury involving the insertion of a paper clip into his umbilical area. During the

assessment, Plaintiff reportedly told an officer that he was going to "get them back eventually" and stated that he was going to "cut and rip his intestines out." Plaintiff also reportedly expressed pride in himself for the resistance he displayed during a use-of-force incident. J. Duprel documented that Dr. Greenfield was notified and that the plan was for Plaintiff to return to his dormitory. (Exhibit CK, CENT 3004-3005).

96. On December 16, 2021, RN Perry documented that Plaintiff required an emergency transfer to an outside hospital following an act of self-harm. RN Perry contacted APRN Collins regarding the incident and notified Dr. Emanoilidis and Dahiman in person of the emergency transfer. In connection with the incident, APRN Collins ordered and reviewed an abdominal x-ray to confirm the presence of an ingested foreign body and conducted a physical examination. APRN Collins documented that Plaintiff had inserted a paper clip into his abdominal area, with approximately a one-eighth-inch protrusion visible and noted Plaintiff's prior injury history involving two paper clips. APRN Collins also reviewed emergency room records relating to a post-use-of-force examination, which reflected that Plaintiff had been evaluated following the use of chemical and physical force and had been showered. (Exhibit CL, CENT 2991-2993, 2996-2997, 3001-3003, and 3006).

97. On December 17, 2021, RN Cribb documented an emergency transfer to an outside hospital following another act of self-harm. Mental health staff, including Dr. Greenfield, were notified by telephone after Plaintiff reportedly

inserted a paper-clip-like object into the left side of his neck near the carotid artery. APRN Collins reviewed and signed the emergency documentation. (Exhibit CM, CENT 2990-2991).

98. On December 20, 2021, APRN Collins reviewed records concerning medications related to Plaintiff's foreign body insertions. On the same date, APRN Collins ordered radiological studies to evaluate and monitor foreign bodies. Imaging of the neck revealed a two-centimeter radiopaque foreign body in the left lateral neck. APRN Collins also ordered follow-up x-rays for continued monitoring of Plaintiff's foreign bodies and submitted a consultation request and physical examination request concerning a self-inserted foreign body in Plaintiff's neck. (Exhibit CN, CENT 2974, 2979-2981, 2983, 2975-2978, and 2982).

99. On December 27, 2021, mental health staff completed a Daily Nursing Evaluation of Plaintiff. On the same date, APRN Collins ordered cervical spine x-rays for further evaluation. (Exhibit CO, CENT 2963-2965, 2966-2968).

100. On December 28, 2021, RN Perry completed a Mental Health Emergency assessment, which was reviewed by Mental Health Director Dr. Emanoilidis. During the assessment, Plaintiff stated that if he was returned to his cell, he would engage in self-harm "one way or another," whether by using objects or by injuring himself against objects. On the same date, Dr. Emanoilidis and Jennifer Duprel documented a Mental Health Daily Nursing Evaluation and Plaintiff's placement on 23-hour observation status. (Exhibit CP, CENT 2958-2962).

101. On January 10, 2022, Dr. Emanoilidis submitted a staff request and referral to Mental Health Outpatient Services relating to Plaintiff's self-harm involving a paper clip. (Exhibit CS, CENT 4369).

102. Between January 12 and January 13, 2022, restraint observation checklists were completed concerning Plaintiff's placement in restraints. Dr. Emanoilidis reviewed and signed the documentation on January 14, 2022. (Exhibit CT, CENT 4358-4363).

103. On February 23, 2022, RN M. Harrold documented that Plaintiff had returned from Jacksonville Memorial Hospital. RN Harrold notified APRN Collins and Dr. Greenfield that Plaintiff's suture line was intact, with no dressing and no drainage observed, and that Plaintiff was to be placed on SHOS status. (Exhibit CU, CENT 4269).

104. On February 24, 2022, APRN Collins documented that Plaintiff refused assessment while on SHOS status and continued monitoring Plaintiff's condition through review of radiological findings. (Exhibit CV, CENT 4245-4249 and 4261-4266).

105. On February 25, 2022, APRN Collins was notified of concerns that Plaintiff may have ingested a battery while housed in an observation cell. APRN Collins ordered further evaluation and consultation. (See Exhibit DS, CENT 4251-4260).

106. On March 4 and March 11, 2022, APRN Collins continued follow-up treatment related to Plaintiff's self-harm behavior, including review of outside

hospital evaluations and examination of a healed abdominal surgical wound. (See Exhibit CW, CENT 4225-4228).

107. On April 21 and April 22, 2022, Plaintiff inserted a pen cartridge into his abdomen and another object into his urethra. APRN Collins ordered diagnostic imaging, documented the injuries, and personally notified Dr. Emanoilidis regarding the self-harm incident. APRN Collins coordinated Plaintiff's emergency transfer to an outside hospital for treatment. (Exhibits CX and CY, CENT 4176-4200 and CENT 4181-4185).

108. On April 22, 2022, Dr. Emanoilidis responded to Plaintiff's grievance, alleging inadequate mental health treatment. Dr. Emanoilidis documented that Plaintiff had previously been evaluated by a Florida Department of Corrections psychologist who determined that Plaintiff did not suffer from a significant mental illness, noted that Plaintiff was offered mental health screenings every ninety days, and denied the grievance. (See Exhibits CZ and I, CENT 3814-3819 and CENT 1041-1045).

109. On April 27, 2022, APRN Collins documented follow-up treatment after removal of a foreign body from Plaintiff's abdomen and arranged additional surgical follow-up. (Exhibit DA, CENT 3823-3826).

110. On May 25, 2022, Plaintiff submitted an informal grievance stating, for inadequate medical treatment. Dr. Emanoilidis responded to the grievance stating: “You are a S1. We have offered services consistent with your S1 and Max Management status…You have been offered psychiatric evaluations, brief therapy

visits, counseling wellness checks by multiple psychologists, we have discussed your mental health concerns of recent. As of today, 6-2/22, you appeared to be in good spirits about the direction things were going." Thus, the grievance was denied. (Exhibit DB, CENT 4790-4791).

111. On June 17, 2022, Plaintiff executed a Mental Health Consent Form authorizing telehealth mental health services, which was co-signed by Dr. Emanoilidis. (Exhibit DC, CENT 3649-3651).

112. Between September and October 2022, APRN Collins continued to manage Plaintiff's medical care through medication renewals, consultation requests, provider visits, and follow-up treatment. (Exhibit DD, CENT 3572-3575, 3550-3556, 3549, 3539, and 3529).

113. Between October 27 and November 1, 2022, APRN Collins ordered imaging studies, infirmary monitoring, and follow-up care after Plaintiff inserted additional foreign bodies into his abdomen. (Exhibit DE, CENT 3499, 3471-3483, 3458, and 3432-3434).

114. On November 1, 2022, APRN Collins documented that radiological findings revealed a foreign body requiring specialist evaluation and arranged Plaintiff's urgent transfer for treatment. APRN Collins further documented that Dr. Emanoilidis was personally notified regarding the self-harm incident and transfer. (Exhibit DF, CENT 3423-3424 and 3435-3439).

115. Between November 4 and November 7, 2022, APRN Collins reviewed outside hospital records, evaluated Plaintiff after his return from treatment,

supervised wound care, and performed suture removal. (Exhibit DG, November 2022 Medical Records at CENT 3343-3404).

116. On December 9, 2022, APRN Collins documented that Plaintiff had inserted a paper clip and staple into his abdomen. APRN Collins ordered diagnostic imaging and initiated treatment planning. (Exhibit DH, CENT 3269-3281).

117. On December 12 and December 13, 2022, APRN Collins requested a General Surgery consultation, obtained informed consent, reviewed imaging studies, and documented removal of a foreign body from Plaintiff's abdomen. (Exhibit DI, CENT 3253-3257, 3213, 3240-3245, and 3229-3232).

118. On December 14, 2022, APRN Collins documented review of radiological findings and arranged Plaintiff's transfer for emergency treatment. APRN Collins further documented that Dr. Emanoilidis was notified in person regarding the self-harm incident. (Exhibit DJ, CENT 3220-3225).

119. Between December 15 and December 19, 2022, Plaintiff remained under mental health observation and nursing monitoring while APRN Collins coordinated wound care, consultations, medications, and surgical follow-up. (Exhibit DK, CENT 3202, 3186-3199, 3165-3168, and 3155-3164).

120. On December 28, 2022, Dr. Emanoilidis reviewed and signed an Observation Checklist documenting Plaintiff's continued placement on SHOS status. (Exhibit DL, CENT 3331-3333).

121. Between January 1 and January 9, 2023, Plaintiff received repeated

Mental Health Daily Nursing Evaluations while housed on observation status following continued self-harm behavior. (Exhibit DM, CENT 4750-4755, 4761-4766, 4716-4721, 4698-4709, 4688-4693, and 4669-4686).

122. On January 3, 2023, APRN Collins reviewed radiological studies, referred Plaintiff for surgical evaluation, and documented follow-up treatment after discovery of additional foreign bodies in Plaintiff's abdomen. (Exhibit DN, CENT 4723-4727 and 4740-4744).

123. On January 4, 2023, APRN Collins obtained consent for removal of foreign bodies, supervised removal procedures, and ordered follow-up imaging. (Exhibit DO, CENT 4695 and 4712-4715).

124. On January 17, 2023, Dr. Emanoilidis reviewed an Observation Checklist concerning Plaintiff being placed on Self Harm Observation Status on January 15, 2023. (Exhibit DP, CENT 4573-4574).

125. Between January 17 and January 26, 2023, Plaintiff engaged in multiple acts of self-injurious behavior involving the insertion of foreign bodies. During this time, APRN Collins continued to provide medical care by reviewing imaging studies and outside hospital records, removing additional foreign bodies, referring Plaintiff to surgery, and providing continued follow-up treatment. (Exhibits DQ, CENT 4598-4634).

126. On February 4, 2023, Kessinger, RN, completed a Poisoning/Overdose report after Plaintiff swallowed a quantity of pills during medication pass. Narcan was administered and Plaintiff was referred to Dr.

Emanoilidis for mental health evaluation. During the referral process, Plaintiff denied suicidal intent and stated that he wanted to speak with medical staff. (Exhibit DR, CENT 4555-4558).

## MEMORANDUM OF LAW

### I. Plaintiff Fails To Establish A Constitutional Violation Under 42 U.S.C. § 1983, Deliberate Indifference To A Serious Medical Need.

The Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display "deliberate indifference to serious medical needs of prisoners." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). For decades, the Eleventh Circuit has described a "more than mere negligence" or "more than gross negligence standard" in determining whether an official acted with deliberate indifference to that serious medical need. *See Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) ("To establish deliberate indifference, a plaintiff must demonstrate that the prison officials (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence.") (internal quotations omitted)); *see also Wade v. McDade*, 2024 WL 3354963, at *2 (11th Cir. July 10, 2024).

Recently, however, the Eleventh Circuit determined that those standards conflicted with the Supreme Court's decision in *Farmer* and clarified that courts in this circuit should apply the "subjective recklessness standard" as used in criminal law. *See Id.* at *1; *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

Specifically, the Eleventh Circuit has instructed that to establish liability on an Eighth Amendment deliberate indifference claim, the plaintiff must show first, that he suffered a deprivation that was, "objectively, 'sufficiently serious'" and second, that the defendant acted with "subjective recklessness as used in the criminal law." To demonstrate "recklessness as used in the criminal law" a plaintiff must show that the defendant was actually, subjectively aware that their own conduct caused a substantial risk of serious harm to the plaintiff and even if the defendant "actually knew of a substantial risk to inmate health or safety," they "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Farmer*, 511 U.S. at 834, 39, 44-45); *Wade,* 2024 WL 3354963, at *7.

Thus, "[a]s applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." *Swain v. Junior,* 961 F.3d 1276, 1285 (11th Cir. 2020). Indeed, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) ("As we held in *Daniels,* the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). The Eleventh Circuit has also noted that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does

not constitute deliberate indifference." *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting *Waldrop*, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted).

Here, Plaintiff alleges that Defendants Michael Collins, APRN, Dr. Emanoilidis, Dr. Greenfield, and Dr. Pages were deliberately indifferent to his serious medical and mental health needs by failing to properly diagnose and treat his mental illness, denying him appropriate psychiatric medications and placement in a Mental Health Treatment Facility ("MHTF"), improperly classifying his mental health status, and failing to provide adequate medical treatment for the numerous self-inflicted injuries and foreign bodies he repeatedly inserted into his body. However, the undisputed contemporaneous medical and mental health records directly contradict Plaintiff's allegations and instead demonstrate that the Medical Defendants continuously evaluated Plaintiff, provided ongoing medical and psychiatric treatment, ordered diagnostic testing, prescribed medications, coordinated specialty consultations and emergency hospital transfers when clinically indicated, and exercised professional medical and psychiatric judgment throughout entirety of their care of Plaintiff.

**a. Plaintiff Cannot Demonstrate Deliberate Indifference**

**to a Serious Medical Need.**

To begin, Plaintiff cannot demonstrate deliberate indifference on the part of any Defendant as it pertains to his medical and mental health conditions. Again, as the *Wade* court made clear, to demonstrate "recklessness as used in the criminal law" a plaintiff must show that the defendant was actually, subjectively aware that their own conduct caused a substantial risk of serious harm to the plaintiff and even if the defendant "actually knew of a substantial risk to inmate health or safety," they "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Farmer*, 511 U.S. at 834, 39, 44-45); *Wade,* 2024 WL 3354963, at *7. "Each individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).

As the evidence clearly confirms, Plaintiff received continuous, thorough, and extensive medical and mental health care by all the Medical Defendants and there is absolutely no basis to support Plaintiff's subjective contentions that any Defendant every denied, delayed, or disregarded his care.

*Michael Collins, APRN*

Turning first to Defendant APRN Collins, Plaintiff alleges that Defendant Collins "repeatedly refused" to provide adequate medical care for his self-inflicted injuries, denied him treatment for foreign bodies he inserted into his abdomen, penis, urethra, and neck, "refused" to send him to outside hospitals, denied pain

medication, ignored his requests for surgery and specialist care, and otherwise failed to adequately treat his serious medical needs. (Doc. 39). However, such allegations, as Plaintiff's own 4000+ pages of medical records clearly show, are directly contradicted and his contentions are wholly disingenuous and unsupported, as there is no evidence Defendant Collins ever, at any time, denied, delayed, or disregarded Plaintiff's medical or mental health care. (Exhibit A, Declaration of M. Collins). Indeed, the contemporaneous and extensive medical records confirm Defendant Collins repeatedly and consistently evaluated Plaintiff following his recurrent episodes of self-injurious behavior and provided extensive and prompt care by ordering diagnostic testing and imaging, coordinating emergency hospital transfers for further care, obtaining specialty consultations and post-surgical care, implementing and overseeing post-operative care and monitoring, and securing follow up care, as necessary.

As such, contrary to Plaintiff's allegations, the undisputed evidence demonstrates that Defendant Collins never disregarded or denied any care to Plaintiff relating to his repeated self-injurious behavior. In this numerous instances Plaintiff inserted foreign objects into his body, including pen cartridges into his penis and a staple into an abdominal, a paper clip into his abdomen and neck, etc., Defendant Collins personally evaluated Plaintiff, documented the visible foreign bodies, reviewed emergency room records, and ordered radiological studies. (Ex. , 6/9/21 APRN Collins Note and Radiology Reports at CENT 2643, 2723-2724.); (. P, Emergency Transfer Record at CENT 2991-2993; Abdominal X-

Ray Order and Report at CENT 2996-2997; Physical Examination at CENT 3001-3003; Post-Use-of-Force Record at CENT 3006.). Defendant Collins continued to monitor Plaintiff's condition rather than ignoring it and upon medical determination that Plaintiff required elevated care, promptly arranged for Plaintiff's transfer to an outside hospital, as necessary. (*See generally*, Exhibits BV, BX, BY, BZ, CA, CF, CE, CI, CM, and CN). And, upon Plaintiff's return from any outside care, Defendant Collins continued to monitor Plaintiff's condition, and reviewed and implemented all post-surgical/ hospital recommendations and instructions. (*Id.*); (Exhibit BZ, CENT 2641.)

This pattern repeated throughout 2022 and into January 2023 with Defendant Collins continuing to provide prompt and thorough care with continued evaluations, orders for radiological imaging after new episodes of self-harm, emergency transfers as necessary, and referrals for post-surgical evaluations, wound care, medications, and follow up care. (*See generally*, Exhibits DD, DE, DF, DH, DI, DJ, DK, DN, DO, and DQ).(

On any occasions in which Plaintiff did not receive care by Defendant Collins, it was Plaintiff, not Defendant that refused such medical services. (Exhibit CB and CC, CENT 2586; see also CENT 2580). Even despite these refusals, Defendant Collins proceeded to provide care to Plaintiff.

Even Plaintiff's own administrative grievance alleging that Defendant Collins was denying him proper medical treatment was found to be meritless upon investigation as Plaintiff's own objective records contradicted his claims and

showed that he had just recently been transported to an outside hospital and was actively receiving treatment for his injuries with a pending general surgery consult placed and forthcoming. (Exhibit CJ, CENT 3012.)

Accordingly, far from indifference, the extensive record demonstrates that Plaintiff received appropriate, prompt, and continuous medical treatment by Defendant Collins during the entirety of the three years alleged in his complaint. His allegations against Defendant Collins are consistently contradicted by his own objective medical and administrative records showing he was never denied treatment for his numerous self-injurious behaviors. To the contrary, Plaintiff was repeatedly examined for his condition, ordered diagnostic imaging, transferred to outside hospital care, referred and seen by specialists, admitted to the FDC infirmary for around the clock observation and care, and referred and scheduled for follow up treatment as necessary. Nothing in this record supports Plaintiff's claims that Defendant Collins ever ignored Plaintiff's concerns, refused evaluation of him, or knowingly disregarded his care such that it placed Plaintiff in a substantial risk of serious harm. Indeed, the record demonstrates quite the opposite.

Thus, it is abundantly clear that Plaintiff received ample, thorough, and continuous care that he merely subjectively disagrees with. However, Plaintiff's personal dissatisfaction with his care and the medical judgments and decisions of Defendant Collins, do not arise to deliberate indifference as set forth by the Eleventh Circuit in *Wade*. Plaintiff has failed to produce evidence demonstrating

that Defendant Collins exhibited any indifference in his care of Plaintiff or that he was subjectively aware that his own conduct created any substantial risk of serious harm to Plaintiff and that he then consciously disregarded that risk. Even still, the record very clearly supports that *even if* Defendant Collins "actually knew of a substantial risk" he cannot be found liable under the Cruel and Unusual Punishments Clause" because he very clearly "responded reasonably to the risk" by providing continuous, thorough, and prompt care. *Farmer*, 511 U.S. at 834, 39, 44-45); *Wade,* 2024 WL 3354963, at *7. Accordingly, Defendant Collins is entitled to summary judgment as a matter of law.

*George Emanoilidis, M.D.*

Next, as to Defendant Dr. Emanoilidis, Plaintiff alleges deliberate indifference through purported denials of his requests for psychotropic medications, "refusals" to recommend placement in a Mental Health Treatment Facility ("MHTF"), characterizations of Plaintiff's recurrent self-injurious behavior as behavioral rather than psychiatric in nature, denials of grievances relating to his mental health care, and otherwise failures to provide constitutionally adequate psychiatric treatment. (Doc. 39). As has already been made clear, these allegations are again contradicted by the contemporaneous records, establishing the exorbitant amount of care provided by the Medical Defendants, including Dr. Emanoilidis. (Exhibit D, Declaration of G. Emanoilidis)

Indeed, immediately upon Plaintiff's transfer into Dr. Emanoilidis' care, Plaintiff was provided consistent evaluations, Behavioral Risk Assessments,

individualized treatment plans, infirmary admissions and suicide prevention programs/observation, Behavioral and Self-Injury Reduction Plans, and overall recommendations for treatment and interventions to address Plaintiff's self-injurious behaviors and mental health conditions.

At the outset, upon transfer to Florida State Prison, Plaintiff was admitted for inpatient mental health care and placed on SHOS for self-injurious behavior. (Exhibit X, CENT 2472 and Exhibit H). The following day, Dr. Emanoilidis evaluated Plaintiff in the infirmary, noting Plaintiff declined to participate in his assessment, but continuing to provide treatment and recommended continued observation on SHOS status, and daily counseling. (Exhibit Y, CENT 2406-2408). Dr. Emanoilidis proceeded to conduct evaluations of Plaintiff daily in the infirmary for SHOS, ultimately assigning him an S3 mental health grade, noting Plaintiff's compliance with his prescribed medications and counseling. (Exhibits AA, AC, AD, AF, AE, AH, AJ, F, AE, and AT, CENT 2401-2402; CENT 2399-2400; CENT 2395-2396; CENT 2380-2381; CENT 164-165; CENT 2366-2367; CENT 2351; CENT 159-163; CENT 164-165; and CENT 157-158).

On August 4, 2020, Dr. Emanoilidis again presented Plaintiff to the MDST for review of his treatment progress at which time MDST recommended that Plaintiff remain on SHOS with fifteen-minute observation checks and further consult regarding a possible step-down to Maximum Management status. (Exhibit AL, CENT 2339-2340). Plaintiff was later discharged from SHOS, noting he had been without self-injury for 32 days. (Exhibit X, CENT 2472).

After SHOS discharge, Dr. Emanoilidis continued to evaluate Plaintiff, conducting several Well-Being Checks and later completing his ISP and Self Injury Reduction plan. (Exhibits AQ, AR, AS, and AT, CENT 196-197; CENT 191-192; CENT 190; CENT 157-158). His treatment plan consisted of continued infirmary admission, with daily wellness checks, individual therapy, MDST, and modification of Plaintiff's Behavioral Plan whenever Plaintiff engaged in additional acts of self-injury. (Exhibit AT, CENT 157-158). Dr. Emanoilidis further documented updated treatment goals, revised treatment providers, and scheduled Plaintiff for continuous ISP reviews. (*Id.*) Consistent with that treatment plan, Dr. Emanoilidis continued evaluating Plaintiff on a regular basis, performing nearly daily Well-Being Checks evaluating Plaintiff's behavioral functioning and progress and recommending further monitoring, Well-Being Checks, and weekly individual therapy. (Exhibits AS, AU, AV, AW, and AX, CENT 190; CENT 189; CENT 188; CENT 187; CENT 186.)

When Plaintiff later engaged in self-injurious behavior by inserting objects into his abdomen and penis, Dr. Emanoilidis did not ignore Plaintiff's conduct. Instead, he immediately performed a Mental Health Emergency Evaluation, documented Plaintiff's psychological presentation, attributed Plaintiff's conduct to poor coping skills, and recommended Plaintiff's admission to Self-Harm Observation Status ("SHOS") following medical clearance. (Exhibit AY, CENT 171-172.)

Dr. Emanoilidis, likewise, repeatedly reassessed Plaintiff's suicide risk and

mental health status through formal Behavioral Risk Assessments. On October 8, 2020, Dr. Emanoilidis completed a Behavioral Risk Assessment assigning Plaintiff a severe-risk score of 48 while designating Plaintiff as an S3 inmate. (Exhibit BC, CENT 2880-2882.) Dr. Emanoilidis subsequently completed additional Behavioral Risk Assessments on April 1, April 22, May 6, and June 10, 2021, consistently documenting Plaintiff's continued high-risk status and modifying Plaintiff's mental health classification accordingly. (Exhibits BQ, BR, BS, and BW, CENT 2874-2876; CENT 2871-2873; CENT 2868-2870; and CENT 2865-2867). During 2021, Dr. Emanoilidis also developed a formal Behavioral Plan specifically directed toward Plaintiff's recurrent self-injurious behavior. (Exhibit BT, CENT 2735).

The record also demonstrates that Dr. Emanoilidis repeatedly evaluated Plaintiff following psychiatric emergencies and acts of self-harm. On January 7, 2021, Dr. Emanoilidis presented Plaintiff before the MDST for review of Plaintiff's treatment progress and documented a treatment plan involving short-term therapy directed toward stabilization of Plaintiff's self-injurious behavior. (Exhibit BI, CENT 2849). Several days later, after Plaintiff complained regarding his mental health treatment, case-management assignment, telephone privileges, and wound-care supplies, Dr. Emanoilidis personally conducted a Mental Health Emergency Consultation, addressed each of Plaintiff's concerns, confirmed scheduled appointments, encouraged Plaintiff regarding his treatment, and documented that Plaintiff appeared satisfied following the consultation. Dr.

Emanoilidis also provided Plaintiff with additional sick-call request forms. (Exhibit BL, CENT 2846-2847.)

Dr. Emanoilidis continued to remain actively involved whenever Plaintiff engaged in additional acts of self-harm during 2021 and 2022. When Plaintiff inserted paper clips into his abdomen and neck in December 2021, Dr. Emanoilidis was personally notified of the emergency hospital transfers, reviewed Mental Health Emergency Assessments, placed Plaintiff on 23-hour observation status, completed Daily Nursing Evaluations, referred Plaintiff to Mental Health Outpatient Services, reviewed restraint observation documentation, and continued monitoring Plaintiff through SHOS. (Exhibits CK, CP, CS, and CT, CENT 3004-3005; CENT 2958-2962; CENT 2952-2956; CENT 4369; CENT 4358-4363.) Later, after Plaintiff continued engaging in self-injurious conduct during 2022, Dr. Emanoilidis was again personally notified of Plaintiff's emergency transfers, responded to Plaintiff's mental health grievances, approved telehealth mental health services, and continued reviewing Plaintiff's observation status through January 2023. (Exhibits CY, CZ, DB, DC, DL, and DP, CENT 4181-4185; CENT 3814-3819; CENT 4790-4791; CENT 3649-3651; CENT 3331-3333; CENT 4573-4574.)

Dr. Emanoilidis also performed numerous Behavioral Risk Assessments throughout the relevant period, including assessments on October 8, 2020, April 1, April 22, May 6, and June 10, 2021. During each assessment, Dr. Emanoilidis documented Plaintiff's then-current presentation, assigned a Behavioral Risk

Assessment score, and designated Plaintiff's corresponding suicide risk classification. (Exhibits BC, BQ, BR, BS, and BW, CENT 2880-2882; CENT 2874-2876; CENT 2871-2873; CENT 2868-2870; and CENT 2865-2867). Likewise, throughout August 2020, Dr. Emanoilidis completed repeated Well-Being Checks documenting Plaintiff's behavioral functioning and assigning S-grade classifications based upon his contemporaneous clinical observations. (Exhibits AS, AU, AV, and AX, CENT 190; CENT 189; CENT 188; CENT 187; and CENT 186).

To the extent any care by Dr. Emanoilidis, or other providers, did not occur, it was due to Plaintiff's refusal, not any decision or act by his providers. Exhibits BK, BN, and BP, CENT 2603; CENT 2601; CENT 2600).

Accordingly, these extensive records of care do not support any of Plaintiff's claims of "indifference" by Dr. Emanoilidis. Plaintiff's contentions that he was "denied" psychotropic medications, "refused" placement in a specific mental health facility, or that his condition was "mischaracterized" are all unsupported by his own record and do not arise to a claim for cruel and unusual punishment under the Eighth Amendment. Rather, as shown, Dr. Emanoilidis made numerous recommendations for the mental health treatment of Plaintiff as it pertained to his repeated episodes of self-injurious behavior, and made decisions surrounding Plaintiff's care and treatment regime using his medical skill and judgment in line with his extensive experience as a licensed psychiatric physician.

As made clear by the numerous and expansive objective records, Plaintiff was never denied mental health treatment or intentionally "mischaracterized" or

"misdiagnosed." Rather, Plaintiff underwent continuous mental, physical, and behavioral assessments by several providers, including Dr. Emanoilidis, who determined his best course of mental health treatment using their independent medical judgment. Thus, contrary to Plaintiff's claims, he was never "refused" psychotropic medication or placement in a MHTF. Rather, he was extensively evaluated and determined that he did not meet the criteria for placement in a MHTF or for psychotropic medication, and was instead recommended for infirmary admission, SHOS placement, behavioral assessments and therapy. Likewise, as explained in his grievance response, Plaintiff's self-injurious behavior was better addressed through psychotherapy and behavioral interventions rather than psychotropic medication. (Exhibits BO, CZ, and DB, CENT 2932-2933; CENT 3814-3819; and CENT 4790-4791.) Additionally, his assigned mental health "S" grades were not improperly or arbitrarily assigned or "manipulated" as Plaintiff believes. Rather, his records reflect that his "S-grade" classification was based upon a thorough assessment and medical determination, which varied frequently depending upon Plaintiff's psychiatric presentation and present risk factors. In many instances, Plaintiff's "S-grade" was decreased in light of his treatment compliance and noticeable decrease in self-injurious behaviors. Similarly, his "S-grade" was noticeably increased upon a relapse into self-injurious behaviors.

Thus, it is clear that Plaintiff's claim hinges upon a disagreement with the care rendered by Dr. Emanoilidis and the independent medical decisions he made as it pertained to Plaintiff's mental health condition. However, absent from the

record is evidence that Dr. Emanoilidis' knowingly disregarded a substantial risk of serious harm to Plaintiff or acted in a way that arises to criminal recklessness. Rather, it is evident that Plaintiff was provided extensive and continuous treatment by Dr. Emanoilidis that Plaintiff simply disagrees with. However, again, Plaintiff's subjective disagreement with these medical judgments does not turn them into a constitutional violation merely because Plaintiff is a state prisoner who "did not get the type and amount of care he desired when he desired it" *Thompson v. Centurion,* 2025 WL 1088751 (N.D. Fla. Jan. 13. 2025) *recommendation approved and rejected in part at* 2025 WL 927065 at *2-3 (N.D. Fla. March 27, 2025)(upholding dismissal where denial of Gabapentin and holding "the Constitution doesn't require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good.' Plaintiff alleged lots of care—just not the precise care he wanted."); *Monteleone v. Corizon*, 686 F. App'x 655, 659-60 (11th Cir. 2017)(discontinuation of Neurontin was sound in medical judgment and the failure to substitute a more effective medication insinuated negligence, but was not deliberate indifference).

Plaintiff's claims against Dr. Emanoilidis are sound in medical judgment and may insinuate negligence, at *most*, but not indifference, which requires actions equivalent to criminal recklessness. *Rogers v. Evans,* 792 F. 2d 1052, 1058 (11th Cir. 1986); *Estelle,* 429 U.S. at 106; *Mandel,* 888 F. 2d at 787-88 (mere negligence or medical malpractice "not sufficient" to constitute deliberate indifference); *Wade,* 2024 WL 3354963, at *7. Dr. Emanoilidis is therefore entitled to summary

judgment on Plaintiff's Eighth Amendment deliberate indifference claim.

*Beltran Pages, M.D.*

Similar to Defendant Emanoilidis, Plaintiff alleges that Dr. Pages was deliberately indifferent to his serious mental health needs by refusing to diagnose him with Bipolar Disorder, improperly characterizing his mental illness as behavioral rather than psychiatric, denying him psychotropic medication, refusing to recommend placement in a MHTF. and otherwise failing to provide constitutionally adequate mental health treatment. As has been clearly established, the contemporaneous mental health records and extensive evidence, do not support these contentions. (Exhibit C, Declaration of B. Pages).

Unlike the extensive care provided by Dr. Emanoilidis, Dr. Pages' had very minimal involvement in Plaintiff's treatment, limited to a distinct period of May 2020, upon Plaintiff's transfer to Lake CI. Dr. Page's involvement in Plaintiff's mental health consisted of an evaluation on May 12 and 13, 2020. Upon Plaintiff's transfer to Lake CI, Dr. Pages attempted a mental health assessment of Plaintiff, to which he refused. Plaintiff then later assaulted and stabbed a correctional officers four times. (Exhibit J, CENT_4786). Dr. Pages attempted a second evaluation of Plaintiff on May 13, 2020, at which time Plaintiff denied suicidal ideation, homicidal ideation, and hallucinations and was documented to lack remorse for his actions. Dr. Pages recommended Effexor and referred Plaintiff for Multidisciplinary Service Team ("MDST") review. (Exhibit K, CENT 4779-4780). Dr. Pages then participated in the MDST review wherein it was determined that a

MHTF was not an appropriate level of care for Plaintiff as there was no evidence of psychosis or another qualifying mental health diagnosis, and the MDST team and Dr. Pages collectively agreed upon Plaintiff's placement in Close Management ("CM") under maximum management and institution of medication changes, including initiation of Effexor. (Exhibits M and J, CENT 4785 and CENT 4786).

After Plaintiff later engaged in self-injurious behavior by inserting foreign objects into this neck and abdomen, motivated by his desire to obtain hospitalization, he was transferred to the hospital, and Dr. Pages classified Plaintiff's grade as an S6.(Exhibits N and O, CENT 42-45, CENT 4786, and CENT 629-643). Prior to Plaintiff's return, Dr. Pages, in conjunction with the MDST at Lake CI and Dr. M. Coetzee, Psychiatrist, concluded that Plaintiff's actions were premeditated in nature and that he did not require MHTF Care and approved Dr. Pages recommendation to add a diagnosis of Antisocial Personality Disorder and remove Plaintiff's Bipolar Disorder diagnosis and to start Plaintiff on Effexor and Benadryl. (Exhibit N, CENT_4786).

As such, contrary to Plaintiff's claims of "denials" or "refusals" for medications, MHTF, or a certain diagnosis by Dr. Pages, his records actually reflect that Dr. Pages, in conjunction with MDST and Lake CI Psychiatrist, used their medical judgment and determined that Plaintiff did not qualify for a MHTF because evaluation revealed that his actions were premeditated and thus behavioral in nature, and therefore a diagnosis of Bipolar Disorder was not supported and was therefore discontinued. Moreover, contrary to Plaintiff's claim,

Dr. Pages did recommend Effexor for Plaintiff's condition, which was approved by the MDST and Psychiatrist at Lake CI.

Significantly, the record contains no evidence that Dr. Pages ignored Plaintiff's requests for mental health treatment, refused to evaluate Plaintiff, prevented Plaintiff from receiving emergency psychiatric care, or consciously disregarded a substantial risk of serious harm. Instead, the evidence confirms that Dr. Pages personally evaluated Plaintiff, presented Plaintiff's case for multidisciplinary review, and collectively agreed with the MDST and Lake CI Psychiatrist to initiate a treatment plan for Plaintiff's self-injurious behavior, which included admission into CM and initiation of Effexor medication. Thus, like his other claims, Plaintiff is again challenging the medical judgment and decisions by Dr. Pages and simply disagrees with the care rendered. However, these contentions amount to nothing more than a disagreement with Dr. Pages' professional psychiatric judgment and medical decisions, which are insufficient to establish deliberate indifference as a matter of law. *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995).

Accordingly, Plaintiff cannot establish deliberate indifference under the Eighth Amendment and Dr. Pages is entitled to summary judgment.

*Jonathan Greenfield, M.D.*

Finally, as to Defendant Dr. Greenfield, Plaintiff contends that Dr. Greenfield was deliberately indifferent to his serious mental health needs through his supervisory role as the Assistant Statewide Psychiatric Director. Plaintiff seeks

to hold Dr. Greenfield liable for the purported inadequate mental health care he received including alleged refusals of psychotropic medications, denial of placement in a MHTF, inaccurate mental health classifications, and failures to intervene despite Plaintiff's repeated acts of self-harm. These allegations, however, are directly contradicted by the contemporaneous mental health records, which establish that Dr. Greenfield's involvement in Plaintiff's care was exceedingly limited and Plaintiff received extensive and thorough mental and medical care during the entirety of his alleged time period. (Exhibit B, Declaration of J. Greenfield).

Indeed, the record reflects that Dr. Greenfield never physically examined Plaintiff at any time or had any interactions with him. Rather, Dr, Greenfield, as an Assistant Statewide Psychiatric Director, acted in a supervisory role, for all facilities and was available to providers for psychiatric consultations during emergencies, when needed. Records also indicate Dr. Greenfield was available for any psychiatric emergencies for Plaintiff, if needed. (Exhibit P, CENT 4788.)

Likewise, records confirm Dr. Greenfield reviewed and approved the treatment plan developed by Dr. Emanoilidis on July 27, 2020, which included Plaintiff's continued placement on SHOS, daily counseling, development of a Self-Injury Reduction Plan, Behavioral Risk Planning, Individualized Service Planning, and a structured step-down process as Plaintiff demonstrated sustained behavioral stability. (Exhibits AI, F, AJ, AA, Y and X, CENT 2890 CENT 159-165, CENT 2351, CENT 2401-2402, CENT 2406-2408, and 2472.)

Thereafter, Dr. Greenfield's involvement remained strictly limited to his supervisory role. Records demonstrate he was notified, per protocol, on the four occasions when Plaintiff engaged in significant acts of self-harm or required emergency hospitalization. During these times, Plaintiff was actively receiving medical and psychiatric treatment and was transferred to outside care, when required. Exhibits CD, CK, CM, and CU, (CENT 2668-2669, CENT 3004-3005, CENT 2990-2991, CENT 4269).

Thus, there is no evidence that Dr. Greenfield denied Plaintiff psychiatric care, refused to evaluate Plaintiff when consultation was requested, prevented Plaintiff from receiving emergency medical treatment, discontinued necessary observation status, or knowingly disregarded any substantial risk of serious harm. Likewise, there is no evidence that Dr. Greenfield was aware of any risk of serious harm to Plaintiff in the medical care being rendered to him by his providers. Rather, the objective record confirms Plaintiff was repeatedly seen and evaluated for all of his mental health concerns and episodes of self-injurious behavior and was never denied or delayed medically necessary care. Deliberate indifference is an individualized inquiry, based upon what each defendant *knows*, therefore any actions or statements of other Defendants or individuals cannot be inputted onto Dr. Greenfield. Plaintiff must set forth evidence of actual subjective knowledge on the part of Dr. Greenfield of a serious risk of harm to Plaintiff and evidence of a clear disregard of that risk, in order to sustain his claim for deliberate indifference. As the expansive 4000+ pages of medical records confirm, no such evidence exists,

therefore, Dr. Greenfield is entitled to summary judgment as a matter of law.

**b. Plaintiff Fails To Demonstrate An Injury or A Causal Connection Between His Alleged Injury And Defendants' Actions.**

In addition to his failure to establish deliberate indifference on the part of any Medical Defendant, Plaintiff also fails to establish a causation between any constitutional deprivation of a constitutional right and any compensable injury. As discussed herein, the contemporaneous medical and mental health records demonstrate that Plaintiff received continuous treatment throughout the relevant period, including repeated physical and psychiatric evaluations, diagnostic imaging, medication management, Behavioral Risk Assessments, Self-Harm Observation Status reviews, multidisciplinary treatment planning, emergency hospital transfers, specialty consultations, wound care, and follow-up treatment after each episode of self-injurious behavior. Plaintiff's self-injurious behavior existed well before Defendants' respective involvement in his care, and continued to occur well after such involvement. Not only does the undisputed evidence refute Plaintiff's contention that these Defendants ignored his serious medical or mental health needs, but the evidence also does not demonstrate any injuries suffered by Plaintiff that were caused by the medical treatment rendered to Plaintiff by any Defendant. Indeed, Plaintiff's self-injurious behavior predated his treatment by Defendants and his continued acts of self-harm were admittedly motivated by his desire to be transferred to an outside hospital or due to power struggles and anger at the FDC/correctional officers, and not from the medical care rendered by

Defendants. Indeed, each time Plaintiff engaged in self-injurious conduct, Defendants or other providers promptly evaluated Plaintiff, provided treatment, transferred him to higher care when needed, and arranged for continued monitoring and further medical intervention as clinically indicated.

Accordingly, Plaintiff cannot establish the requisite causal connection between any conduct attributable to these Defendants and the injuries alleged in the Amended Complaint. Rather, it appears all of Plaintiff's injuries were self-inflicted, long predating Defendants medical care, and any of Plaintiff's continued self-injurious actions were/are the result of his own unfortunate behavioral impairments, as opposed to the medical care rendered by the Medical Defendants.

For those reasons, there is no causal connection between Plaintiff's alleged injury and the actions of the Medical Defendants and Plaintiff is therefore unable to sustain a constitutional claim against them. Moreover, as Plaintiff fails to demonstrate an actual injury on the part of these Defendants, he is not entitled to compensatory damages. *Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir. 1994)(plaintiff retains the burden of demonstrating "a specific, actual injury caused by the defendants' conduct" to collect compensatory damages.)

**II. Plaintiff is Not Entitled to Punitive Damages.**

Finally, Plaintiff fails to sustain a claim for punitive damages against the Medical Defendants. Plaintiff cannot set forth any evidence demonstrating that any of these Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of others

as entitle Plaintiff to punitive damages. *Hooks v. Brewer*, 818 F. App'x 923, 931 (11th Cir. 2020) (quoting *Smith v. Wade*, 461 U.S. 30, 55 (1983)). Rather, as discussed, the record reflects that Plaintiff did not suffer any injuries attributable to the Medical Defendants and Plaintiff was provided with prompt medical care and examination. Merely because Plaintiff subjectively disagrees with that care does not form the basis for a constitutional claim and does not support a finding of deliberate indifference on the part of the Medical Defendants. Therefore, the record does not support Plaintiff's contentions that the Medical Defendant's actions were evil, reckless, or callously indifferent and Plaintiff is not entitled to punitive damages.

## CONCLUSION

For the reasons stated herein, Plaintiff is unable to support his claim that the Medical Defendants violated his Eighth Amendment rights based on deliberate indifference to a serious medical need because the evidence fails to show a constitutional violation, deliberate indifference, causation, injury, or damages.

**WHEREFORE**, Defendants, Michael Collins, NP, Dr. Jonathan Greenfield, Dr. Beltran Pages, and Dr. George Emanoilidis, respectfully request that this Court enter an Order granting summary judgment in their favor together with such other and further relief as the Court deems just and appropriate.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **July 8, 2026**, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will provide electronic notification of filing to counsel of record. I further certify that I provided the foregoing document by first-class U.S. mail to the following non-CM/ECF participant: Antonio K. Adams, #U08976, Florida State Prison, P.O. Box 800, Raiford, FL 32083.

*/s/ Rachel E. Eilers*
Ethen R. Shapiro (FBN 669881)
Rachel E. Eilers (FBN 1019587)
Alexandra Guerra (FBN 1060204)
Hill Ward Henderson
P.O. Box 2231
Tampa, FL 33601-2231
(813)221-3900
(813)221-2900 – facsimile
Ethen.Shapiro@hwhlaw.com
Rachel.Eilers@hwhlaw.com
Alexandra.Guerra@hwhlaw.com
*Attorneys for Defendants Michael Collins, NP, Dr. Johnathan Greenfield, Dr. Beltran Pages, and Dr. George Emanoilidis.*